ARNOLD & PORTER KAYE SCHOLER LLP
JOHN C. ULIN (SBN 165524)
john.ulin@arnoldporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
T: (213) 243-4000
F: (213) 243-4199

JABA TSITSUASHVILI (SBN 309012)
jaba.tsitsuashvili@arnoldporter.com
601 Massachusetts Avenue NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAUDIA SARAHI RUEDA VIDAL,<br><br>Plaintiff,<br><br>vs.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; LEE FRANCIS CISSNA, Director of USCIS, in his official capacity; KATHY A. BARAN, Director of USCIS California Service Center, in her official and individual capacities; ANDREW K. BOLTON, DANIEL BRIGHTMAN, and DOES 1 through 10, USCIS agents and U.S. Border Patrol officers, in their individual capacities,<br><br>Defendants. | Case No. 2:18-cv-9276<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES;**<br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff Claudia Sarahi Rueda Vidal ("Ms. Rueda") brings this Complaint seeking declaratory and injunctive relief against the agency Defendants and damages against the individual Defendants.

Ms. Rueda is the paradigmatic "Dreamer." She has lived in and contributed to the Los Angeles community since she was six years old. As a college student and immigrants' rights activist, she promotes civic engagement and community education. As a well-known leader of California's immigrants' rights movement and the Los Angeles Immigrant Youth Coalition, her speech and activism have garnered media attention, and she has received the support of United States Senator Kamala Harris and Los Angeles Mayor Eric Garcetti, among others.

Ms. Rueda is a law-abiding and motivated young person who is on the verge of obtaining a college degree. She has no criminal history. Her encounters with law enforcement consist of two arrests at peaceful protests. Prosecutors pursued neither.

This case is about two discrete unlawful actions by government officials in 2017 in retaliation for Ms. Rueda's constitutionally protected political speech:

- first, an unlawful and retaliatory seizure, search, and arrest of Ms. Rueda, pursuant to Defendants' pattern and practice of targeting and attempting to silence immigrants' rights activists since early 2017;
- second, an unlawful and retaliatory denial of Ms. Rueda's application for Defendants' Deferred Action for Childhood Arrivals ("DACA") status, in violation of the program's policies and criteria, binding procedures, and longstanding practices.

The seizure, search, and arrest violated 8 C.F.R. §§ 287.3 and 287.8 and the Fourth Amendment. The DACA status denial violated the Administrative Procedure Act ("APA") and the Fifth Amendment's guarantees of due process and equal protection. Both unlawful actions were in retaliation for political speech, in violation of the First Amendment.

1

\*\*\*\*\*\*

In April 2017, Ms. Rueda garnered media attention and the backing of community and political leaders in support of her successful campaign protesting the arrest and detention of her mother by Defendants' immigration officers.  Less than one week after Ms. Rueda's campaign helped secure her mother's release, Defendants' plainclothes officers surrounded and arrested Ms. Rueda in the early morning outside of her home.  They did not obtain a warrant, identify themselves, provide any warning or explanation, have any reasonable suspicion, or inform Ms. Rueda of any of her rights or where they were taking her.  On information and belief, the officers were Defendants Andrew K. Bolton, Daniel Brightman, and one or more Doe Defendants who directed, initiated, and/or participated in the seizure, search, and arrest.  They violated 8 C.F.R. §§ 287.3 and 287.8 and the Fourth Amendment.

Ms. Rueda spent three weeks in immigration detention without any immigration charges filed.  On June 9, 2017, an Immigration Judge determined that she is not a flight risk or a public safety threat, and ordered that she be released on her own recognizance—*i.e.*, without any bond required.  On the government's appeal, the Board of Immigration Appeals upheld the Immigration Judge's release order.

Days after her release from immigration detention, Ms. Rueda submitted a timely, complete, and robust DACA application to Defendant United States Citizenship and Immigration Services ("USCIS").  Ms. Rueda's complete DACA application included the required employment authorization application and $495 filing fee.  It demonstrated that Ms. Rueda meets the DACA status criteria, including the age, residency, education, criminal history, and public safety requirements.  Financial inability was the only reason Ms. Rueda had not previously applied for DACA status.

Ms. Rueda's DACA application contained letters of support from over a dozen community and political leaders, including federal and local lawmakers, university administrators, and professors.

Ms. Rueda attended the mandatory background check appointment scheduled by USCIS shortly after submitting her DACA application.  She did not receive any other correspondence from USCIS for over three months.  In October 2017, Defendant Kathy A. Baran, Director of the USCIS California Service Center, sent Ms. Rueda a one-line DACA denial notice.  The notice did not provide any reason or explanation for the denial.  Nor had USCIS or Baran ever issued Ms. Rueda a Request for Evidence ("RFE") or Notice of Intent to Deny ("NOID")—as required by the binding and non-discretionary policies and procedures established in the Department of Homeland Security ("DHS") DACA Standard Operating Procedures ("DACA SOP").

Since 2012, USCIS agents have administered the DACA program pursuant to: (1) the binding policies established by DHS's June 15, 2012 DACA Memo, including its longstanding objective DACA status criteria; (2) the comprehensive DACA SOP, which establishes binding and non-discretionary policies and procedures for processing and evaluating DACA status applications; and (3) the standard practice of approving DACA status applications for individuals who meet the objective DACA status criteria.

Under the APA, this Court "shall compel agency action unlawfully withheld or unreasonably delayed[,] and hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right . . .; [or] without observance of procedure required by law."  5 U.S.C. § 706(1)-(2).  This Court must set aside agency action that (1) is done without reason or explanation; (2) fails to abide by the agency's own binding policies or procedures; (3) is an unexplained or irrational departure from past practice; (4) is pursuant to an unwritten policy that contradicts a binding written one; or (5) is retaliatory.

USCIS's denial of Ms. Rueda's DACA status application suffers from the following fatal constitutional and statutory flaws:  (1) failure to provide any reason or

3

explanation; (2) failure to abide by the binding terms of the DACA Memo and the DACA SOP, which establish the objective DACA status criteria and require a pre-denial RFE and/or NOID and opportunity to respond; (3) an unexplained and irrational departure from USCIS's years of past practice of approving DACA applications for individuals who meet the objective DACA status criteria (or at least issuing a pre-denial RFE and/or NOID and providing an opportunity to respond); (4) acting pursuant to an unwritten policy of ignoring the terms of the DACA Memo and the DACA SOP, in direct violation of various DHS memos, public guidance, and statements to Congress that the terms of the program have not changed—including its definition of who is and is not an "enforcement priority"; and (5) retaliation for her political speech and activism in support of immigrants' rights generally and her mother specifically.

Like hundreds of thousands of other young people approved for DACA status before and after her, Ms. Rueda met and continues to meet all of the objective DACA status criteria. By failing to provide her (1) any reason or explanation for her DACA status denial or (2) the RFE and/or NOID and an opportunity to respond required by the DACA SOP, USCIS and Baran violated the fundamental principles of administrative law. USCIS and Baran also violated Ms. Rueda's Fifth Amendment right to due process by ignoring the DACA SOP's binding procedures—which require notice and an opportunity to respond to an RFE and/or NOID before a DACA status denial.

Finally, because the only discernible difference between Ms. Rueda and the hundreds of thousands of others who have been approved for DACA status is her political speech and activism against Defendants' immigration practices, USCIS's and Baran's departure from DACA's binding policies and procedures and from USCIS's past practice violated the First Amendment's prohibition against retaliation for political speech and the Fifth Amendment's guarantee of equal protection.

For these reasons and as more fully set forth below, Ms. Rueda seeks a declaration that Defendants have violated 8 C.F.R. §§ 287.3 and 287.8, the Fourth Amendment, the DACA SOP, the APA, the Fifth Amendment, and the First Amendment.  Ms. Rueda respectfully requests that this Court set aside USCIS's denial of her DACA status application and require USCIS to fully and appropriately evaluate her DACA status application in accordance with the DACA SOP, the APA, the Fifth Amendment, and the First Amendment—*i.e.*, without departure from longstanding DACA policies and procedures, including the DACA Memo's DACA status criteria and the DACA SOP's RFE, NOID, and opportunity to respond requirements; without consideration of Ms. Rueda's protected speech or other political activity; and without any allegation or assertion that she is an enforcement priority or poses a public safety threat—which an Immigration Judge has determined she does not (a determination upheld by the BIA).  *See Ramirez Medina v. DHS*, 313 F. Supp. 3d 1237, 1249-52 (W.D. Wash. 2018) (with respect to the evaluation of the plaintiff's DACA status, ordering on the basis of an Immigration Judge's finding: "USCIS is enjoined from asserting, adopting, or relying in any proceedings on any statement or record made as of this date purporting to allege or establish that [the plaintiff] is a gang member, gang affiliated, or a threat to public safety").

## JURISDICTION AND VENUE

1.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

2.    This Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the APA, 5 U.S.C. §§ 701-706.

3.    Venue is proper in the Central District of California because a substantial part of the events or omissions giving rise to this action occurred in this District.  28 U.S.C. § 1391(e)(1).

## PARTIES

4.    Ms. Rueda is a 23-year-old resident of Los Angeles, California.  She was born in Mexico and brought to the United States in 2001, when she was six years

5

old.  She has lived and studied in the United States continuously ever since. She is currently pursuing a bachelor's degree at California State University, Los Angeles.  She is also a community educator, activist, and immigrants' rights leader.

5.  DHS is a cabinet department of the United States federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws.

6.  USCIS is a federal agency within DHS.  USCIS administers the DACA program, including collection of DACA status applications, supporting documents, and fees; issuance of DACA status approval and employment authorization notices; issuance of Requests for Evidence and Notices of Intent to Deny; and issuance of rejection, denial, and termination notices.  USCIS issued Ms. Rueda's unlawful and retaliatory DACA status denial notice.

7.  ICE is a federal law enforcement agency within DHS.  ICE officers directed, initiated, and conducted Ms. Rueda's unlawful and retaliatory seizure, search, arrest, and detention.

8.  CBP is a federal law enforcement agency within DHS.  CBP officers directed, initiated, and conducted Ms. Rueda's unlawful and retaliatory seizure, search, arrest, and detention.

9.  Border Patrol is a security force within CBP.  Border Patrol officers directed, initiated, and conducted Ms. Rueda's unlawful and retaliatory seizure, search, arrest, and detention.

10.  L. Francis Cissna is the Director of USCIS, sued in his official capacity.

11.  Kathy A. Baran is the Director of the USCIS California Service Center, sued in her official and individual capacities.  Ms. Baran issued Ms. Rueda's unlawful and retaliatory DACA status denial notice.

12. Andrew K. Bolton is a Border Patrol officer, sued in his individual capacity. On information and belief, he is one of the officers who conducted Ms. Rueda's unlawful and retaliatory seizure, search, arrest, and detention.

13. Daniel Brightman is a Border Patrol officer, sued in his individual capacity. On information and belief, he is one of the officers who conducted Ms. Rueda's unlawful and retaliatory seizure, search, arrest, and detention.

14. Does 1 through 10 are currently unidentified individuals whose actions, in addition to those of the named Defendants, give rise to Ms. Rueda's claims. They include other officers of ICE, CBP, and Border Patrol who directed, initiated, or conducted Ms. Rueda's unlawful and retaliatory seizure, search, arrest, and detention, and other agents of USCIS who directed, initiated, or issued Ms. Rueda's unlawful and retaliatory DACA status denial notice.

## STATEMENT OF FACTS

### Establishment and Terms of the DACA Program

15. On June 15, 2012, then-Secretary of DHS Janet Napolitano issued a memorandum establishing the DACA program. June 15, 2012 Memorandum from Janet Napolitano to ICE, CBP, and USCIS, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" ("DACA Memo").[1] The DACA Memo explains that the "Nation's immigration laws . . . are not designed to be blindly enforced without consideration to the individual circumstances of each case," and that "additional measures are necessary to ensure that our enforcement resources are not expended on . . . low priority cases." DACA's purpose is to protect "certain young people who were brought to this country as children and know only this country as home [because] these individuals lacked the intent to

---

[1] https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf (last visited Oct. 24, 2018).

violate the law."  In short, these young people who meet the DACA Memo's objective criteria do not "meet [DHS's] enforcement priorities."

16. Accordingly, Defendants instituted a program of deferred action for individuals who were brought to the United States as children and meet specific objective criteria.  Deferred action is a well-established form of administrative action by which the Executive Branch decides, for humanitarian or other reasons, to refrain from seeking individuals' or groups of individuals' removal from the country and authorizes their continued lawful presence for specific and renewable periods.

17. President Obama explained that Defendants instituted DACA because "it makes no sense to expel talented young people, who, for all intents and purposes, are Americans – they've been raised as Americans; understand themselves to be part of this country…[and] want to staff our labs, or start new businesses, or defend our country."  Accordingly, the President explained that DHS would be "taking steps to lift the shadow of deportation from these young people" and giving them "a degree of relief and hope."  The White House, Office of the Press Secretary, "Remarks by the President on Immigration" (June 15, 2012).[2]

18. The DACA Memo establishes the following DACA status criteria:

- came to the United States before the age of 16;
- continuously resided in the United States for at least five years preceding the date of the memorandum and was present in the United States on the date of the memorandum;

---

[2] http://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration (last visited Oct. 24, 2018).

8

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, and does not otherwise pose a threat to national security or public safety; and
- is not above the age of 30.

19. These binding criteria are "objective and non-discretionary." *Gonzalez Torres v. DHS*, 2018 WL 1757668, at \*9 (S.D. Cal. Apr. 12, 2018).

20. Since DACA's inception, these criteria have served as the determinative basis for USCIS's evaluation of individual DACA status applications. *Texas v. U.S.*, 809 F.3d 134, 171-76 (5th Cir. 2015). On September 5, 2017, then-Acting Secretary of DHS Elaine Duke explained that "USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion."[3]

21. The DACA status application process is thorough and comprehensive—requiring the provision of personal, educational, and financial information to USCIS. The DACA status application fee is $495. And the DACA Memo and DACA SOP direct that "[n]o individual should receive deferred action . . . unless they first pass a background check."

22. A recipient of deferred action is eligible to receive employment authorization. 8 C.F.R. § 274a.12(c). As part of the DACA status application process, the DACA Memo directs USCIS to "accept applications to determine whether

---

[3] https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca (last visited Oct. 24, 2018).

[DACA recipients] qualify for work authorization during [their] period of deferred action."  Upon approval, the recipient receives a DACA-specific Employment Authorization Document ("EAD").

23.   USCIS is tasked with implementing the DACA program, including collection of DACA applications, supporting documents, and fees; issuance of DACA status approval and employment authorization notices; issuance of Requests for Evidence and Notices of Intent to Deny; and issuance of rejection, denial, and termination notices.  USCIS promulgated a public policy document detailing how the DACA program operates.  *See* USCIS, "DACA Frequently Asked Questions" ("DACA FAQ").[4]

24.   USCIS agents' discretion is heavily circumscribed by DHS's binding and non-discretionary policies and procedures for all government personnel implementing the DACA program, most significantly by the DACA SOP.  The DACA SOP reiterates the objective and non-discretionary DACA status criteria and sets forth well over a hundred pages of binding policies and procedures for processing DACA applications.

25.   Among a host of other mandatory procedures, the DACA SOP requires that before denying a DACA application, a USCIS agent must provide the applicant an RFE and/or NOID, and an opportunity to respond.

26.   Under the original terms of the DACA program (which have been slightly modified by executive action and court orders, as explained below), DACA status is available for two years, subject to renewal upon reapplication.  A DACA status recipient must reapply, pass another background check, and pay another $495.  Renewal requires that the recipient "met the guidelines for consideration of Initial DACA" and:

---

[4] https://www.uscis.gov/archive/frequently-asked-questions (updated March 8, 2018) (last visited Oct. 24, 2018).

- did not depart the United States on or after August 15, 2012 without advance parole;
- continuously resided in the United States since submitting his or her most recent request for DACA that was approved up to the present time; and
- has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

27. If a DACA applicant's or renewal applicant's background checks or other information indicate that his or her presence "threatens public safety or national security," DACA status will be denied absent "exceptional circumstances." Indicators of such a threat include gang membership, participation in certain aggravated felonies, or participation in activities that threaten the United States. DACA FAQ, Q65.

28. The evaluation of DACA status applications is separate and independent from any removal proceedings in Immigration Court. An individual (1) in removal proceedings, (2) with a final order of removal, or (3) with a voluntary departure order may apply and be approved for DACA status and employment authorization and be considered lawfully present in the United States. DACA FAQ, Qs 7, 10.

**Defendants' Representations to the DACA-Eligible Population**

29. DACA status confers numerous benefits—most significantly, lawful presence and employment authorization—as part of Defendants' recognition that the United States "continue[s] to benefit . . . from the contribution of those young people who have come forward and want nothing more than to contribute to

11

our country and our shared future." Dec. 30, 2016 Letter from then-Secretary of DHS Jeh Charles Johnson to Representative Judy Chu at 2.[5]

30.   Executive and Legislative Branch officials from both political parties have reinforced the promises of the DACA program.  They have publicly acknowledged that hundreds of thousands of DACA status applicants and recipients have relied on Defendants to implement the program and enforce its terms without policies or actions that are arbitrary, capricious, an abuse of discretion, contrary to binding policies and procedures, or unconstitutional.

31.   The DACA SOP memorializes Defendants' commitment to the DACA program and to the DACA-eligible population—effectively limiting the exercise of agency discretion with "nearly 150 pages of specific instructions" for approving, denying, and terminating DACA status.  *Texas v. United States*, 809 F.3d 134, 173 (5th Cir. 2015) (citing the DACA SOP as evidence that DACA is not a discretionary program), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).

32.   Numerous courts have held that the DACA SOP is binding and that its terms and procedures are non-discretionary.  *Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *2 (C.D. Cal. Feb. 26, 2018); *Ramirez Medina v. DHS*, 313 F. Supp. 3d 1237, 1244 (W.D. Wash. 2018); *Gonzalez Torres v. DHS*, 2017 WL 4340385, at *4-6 (S.D. Cal. Sept. 29, 2017); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1334 (N.D. Ga. 2017).

33.   In a similar acknowledgment of the program's consistency and commitment to the DACA-eligible population and DACA status applicants, then-Acting Secretary of DHS Elaine Duke explained in September 2017 that "USCIS has not been able to identify specific denial cases when an applicant appeared to

---

[5] https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf (last visited Oct. 24, 2018).

satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion."

34.  Since the beginning of the DACA program, USCIS has approved DACA applications for over 700,000 young people, over 200,000 from California.[6]

**Continuation, Rescission, and Resumption of the DACA Program**

35.  From January to September 5, 2017, the Trump Administration continued to process and approve new DACA applications, renewal applications, and EADs.

36.  On September 5, 2017, then-Acting Secretary of DHS Elaine Duke announced a plan to phase out the DACA program over a two-year period.  Sept. 5, 2017 Memorandum from Elaine C. Duke to ICE, CBP, and USCIS, "Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)" ("Rescission Memo").[7]

37.  On January 9, 2018 and February 13, 2018, two federal courts enjoined the DACA rescission as to renewal applications.  *Regents of U. of Cal. v. DHS*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018).  On February 14, 2018, USCIS announced that it would resume accepting DACA renewal applications.[8]  However, these courts did not require DHS and USCIS to resume processing initial DACA applications for individuals who had not previously been approved for DACA status, and the agencies were not required to continue the DACA program's parole program for recipients needing to briefly leave the country and return.

---

[6] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_May_31_2018.pdf (last visited Oct. 24, 2018).

[7] https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca (list visited Oct. 24, 2018).

[8] https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction (last updated Feb. 22, 2018) (last visited Oct. 24, 2018).

13

38.   On April 24, 2018, a third federal court entered an order that would vacate the Rescission Memo in its entirety—thus requiring Defendants to process initial DACA applications in addition to renewals—but stayed that order for 90 days to permit DHS to try again in its rescission efforts.  *NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018).  On June 22, 2018, Secretary of DHS Kirstjen Nielsen issued a new memorandum affirming DHS's adherence to the Rescission Memo that three federal courts had enjoined from going into effect.[9] On August 3, 2018, the district court reaffirmed that the Rescission Memo was unlawful in its entirety, and that DHS and USCIS must resume processing initial DACA applications.  *NAACP v. Trump*, 315 F. Supp. 3d 457 (D.D.C. 2018).  On August 17, 2018, the district court stayed, pending appeal, the portion of its order requiring DHS and USCIS to resume processing initial DACA applications, but not the portion of its order requiring the continued processing of DACA renewal applications.  *NAACP v. Trump*, 321 F. Supp. 3d 143 (D.D.C. 2018).  USCIS continues to process DACA applications from individuals who already had DACA, but will not accept new initial applications or applications for advanced parole based on a grant of DACA.

39.   Ultimately, these recent developments do not bear on Ms. Rueda's claims in this case.  She submitted her DACA application in June 2017, when the DACA program was fully operational.  The timing of USCIS's unexplained, unlawful, and unconstitutional denial of her application in October 2017 also has no bearing on this case—Defendants have publicly and repeatedly made clear that no changes in the DACA program's policies and procedures were made either before or after the purported Rescission Memo, and that even after the

---

[9] https://www.dhs.gov/sites/default/files/publications/18_0622_S1_Memorandum_DACA.pdf (last visited Oct. 24, 2018).

Rescission Memo, Defendants' enforcement priorities with respect to the DACA-eligible population have not changed.

- On June 15, 2017, DHS explained that "DACA recipients will continue to be eligible as outlined in the June 15, 2012 memorandum," *i.e.*, the DACA Memo.  DHS, "Frequently Asked Questions:  Rescission of Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ('DAPA')."[10]

- After the Rescission Memo, on September 8, 2017, the Administration again explained that "there are no changes that are being made to the program at this point."  The White House, "Press Briefing by Press Secretary Sarah Sanders and Homeland Security Advisor Tom Bossert."[11]

- On October 3, 2017, DHS explained to the Senate Judiciary Committee that Defendants continue to rely on the DACA Memo, and that their enforcement priority policies and definitions have not changed for the DACA-eligible population:

> "We rely on guidance that was put in place in 2012 when the DACA program was initiated.  That's available on USCIS's website and will tell you what the priorities are for [ICE] and what they are for the Department at large.  Those priorities have not changed. . . . I would tell you in good faith and complete confidence that we are relying on the same priorities that were in place in 2012 and we have not added to them for this population."

---

[10] https://www.dhs.gov/news/2017/06/15/frequently-asked-questions-rescission-memorandum-providing-deferred-action-parents (last visited Oct. 24, 2018).

[11] https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-homeland-security-advisor-tom-bossert-090817 (last visited Oct. 24, 2018).

United States Senate Committee on the Judiciary, "Oversight of the Administration's Decision to End Deferred Action for Childhood Arrivals," Testimony of Michael Dougherty, Assistant Secretary of DHS at 01:10-01:12.[12]

40. In short, DACA remains in effect, and regardless of what has happened after Ms. Rueda submitted her DACA status application, or what may happen going forward, the lawfulness and constitutionality of Defendants' actions must be judged against the program as it existed from June 2017 to October 2017, when Ms. Rueda's DACA application was in the hands of Defendants USCIS and Baran.

**The DACA SOP:  Defendants' Binding and Non-Discretionary Policies and Procedures for DACA Application Processing and Evaluation**

41. Defendants' DACA SOP governs the processing and evaluation of DACA applications.  It heavily circumscribes the discretion of Defendants' officers and agents.

42. All of the Defendants and their officers and agents must comply with the terms and procedures of the DACA SOP; they are binding and non-discretionary. *Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *2 (C.D. Cal. Feb. 26, 2018); *Ramirez Medina v. DHS*, 313 F. Supp. 3d 1237, 1244 (W.D. Wash. 2018); *Gonzalez Torres v. DHS*, 2017 WL 4340385, at *4-6 (S.D. Cal. Sept. 29, 2017); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1334 (N.D. Ga. 2017) ("The SOP states that it is applicable to all personnel performing adjudicative functions and the procedures to be followed are not discretionary.").

---

[12] https://www.judiciary.senate.gov/meetings/oversight-of-the-administrations-decision-to-end-deferred-action-for-childhood-arrivals (last visited Oct. 24, 2018).

43.   The April 4, 2013 version of the DACA SOP is the only version that is publicly available in its entirety, at https://cliniclegal.org/sites/default/files/attachments/daca_sop_4-4-13.pdf.  On information and belief, the terms and procedures of the DACA SOP cited below were unchanged during the period of Ms. Rueda's DACA status application, processing, evaluation, and denial (June 2017 to October 2017).

44.   DACA applications may be rejected, denied, or approved.  A rejection results from circumstances not applicable here (*e.g.*, the applicant is in immigration detention and therefore ineligible for DACA status; the applicant did not pay the entire fee).

45.   The evaluation of DACA applications is separate and independent from any removal proceedings in Immigration Court.  An individual (1) in removal proceedings, (2) with a final order of removal, or (3) with a voluntary departure order may apply and be approved for DACA status and employment authorization and be considered lawfully present in the United States.  DACA SOP at 71-76; DACA FAQ, Qs 7, 10.

46.   Under generally applicable federal regulations, if the DACA status "decision will be adverse to the applicant . . . and is based on derogatory information considered by [USCIS] and of which the applicant . . . is unaware, []she shall be advised of this fact and offered an opportunity to rebut the information and present information in []her own behalf before the decision is rendered," unless the information "is classified under Executive Order 12356 (47 FR 14874; April 6, 1982) as requiring protection from unauthorized disclosure in the interest of national security."  8 C.F.R. § 103.2(b)(16).

47.   Under the DACA SOP, a USCIS agent's denial of a DACA application must be preceded by a Request for Evidence ("RFE") (and 87 days to respond) and/or Notice of Intent to Deny ("NOID") (and 33 days to respond).  "Officers will **NOT** deny a DACA request solely because the DACA requestor failed to

17

submit sufficient evidence with the request (unless there is sufficient evidence in our records to support a denial).  As a matter of policy, officers will issue an RFE or a[n NOID]."  DACA SOP at 45 (emphasis in original); *id.* ("If additional evidence is needed, issue an RFE whenever possible.").

48.  "In general," a DACA status denial is appropriate only after the applicant's response to an RFE or NOID "is insufficient to establish eligibility," and even after an initial RFE, an NOID or a second RFE may be appropriate.  DACA SOP at 105.

49.  An RFE is processed pursuant to a specific eight-step process.  DACA SOP at 101.  An NOID is processed pursuant to a specific eight-step process.  DACA SOP at 102.  A DACA status approval is processed pursuant to a specific nine-step process.  DACA SOP at 104.

50.  A USCIS agent must issue an RFE if any of the DACA status criteria is in doubt (*i.e.*, not yet established by a preponderance of the evidence)—such as age, education, continuous residence, economic necessity for employment authorization, or criminal history.  DACA SOP at 48-70, 83-91; *see* DACA SOP Appendix D (RFE templates).  In these circumstances, where all that is needed is further documentation, an "NOID will rarely be used" in the first instance.  DACA SOP at 101.

51.  Appendix J of the DACA SOP is the mandatory "Notice of Intent to Deny Policy."  When information indicates that a DACA status applicant is not eligible or does not warrant a favorable exercise of discretion, she must receive an NOID and 33 days to respond with "additional information, evidence, or arguments overcoming the grounds for the intended denial."  Appendix E of the DACA SOP provides NOID templates for particular grounds for an intended denial.  They include:

- disqualifying travel outside of the United States during the mandatory continuous presence period;

18

- a conviction for driving under the influence of alcohol or drugs;
- a conviction for domestic violence;
- a conviction for burglary;
- convictions for multiple misdemeanors;
- a felony conviction;
- failure to satisfy one of the objective DACA status criteria.

52. An NOID is required even where Defendants' records indicate that the DACA status applicant is ineligible due to a prior departure from the United States pursuant to an order of deportation.  DACA SOP at 57, 76 ("In these instances, issue a[n] NOID.").

53. An NOID is required even where the DACA status applicant's own documents indicate that she was over 30 years old on June 15, 2012 and therefore categorically ineligible for DACA status.  DACA SOP at 74.

54. These mandatory NOID policies and procedures make clear that a USCIS agent must issue an NOID to a DACA status applicant even where it appears clear from the evidence that the applicant is categorically ineligible for DACA status, including for felony and other serious convictions or obvious age cutoffs.

55. Of course, in Ms. Rueda's case, no such categorical bar exists—yet USCIS and Baran denied her DACA status application without an RFE or an NOID.

56. Other scenarios involving national security or public safety concerns may also ultimately warrant a DACA status denial—but only after an NOID and 33 days to respond.

57. In evaluating whether "public safety concerns" warrant a DACA status denial, the DACA SOP gives examples of the sorts of situations in which a "DACA requestor's criminal record may give rise to significant public safety concerns even where there is not a disposition of conviction."  The illustrative examples are "an individual with multiple DUI arrests, but no convictions" and "an

19

individual arrested for multiple assaults or other violent crimes." DACA SOP at 88.

58. In the absence of significant public safety concerns associated with a history of arrests for DUIs or violent crimes, other arrests are not sufficient to warrant a DACA status denial—particularly without first issuing an RFE and/or NOID and providing an opportunity to respond. DACA SOP at 87 ("When a DACA requestor's RAP sheet indicates an arrest, it is necessary to determine whether the DACA requestor has been convicted of the crime.").

59. Under the unambiguous terms of the DACA SOP, nothing in Ms. Rueda's DACA application or her records justified the denial of her application without an RFE and/or NOID and opportunity to respond.

60. Certain intended DACA status denials require supervisory review. The USCIS agent must "ensure that concurrence has been obtained before processing the DACA request for denial." DACA SOP at 107.

61. An intended DACA status denial must receive supervisory review before the denial is issued if, for example, (1) the DACA status applicant has "no criminal convictions and outwardly appears to meet the [DACA status criteria] . . . [but] there are credible reasons to believe that the requestor poses a threat to national security or public safety," or (2) the DACA status applicant "[c]annot receive prosecutorial discretion because it is not consistent with the Department of Homeland Security's enforcement priorities." DACA SOP at 106.

62. These guidelines suggest that in the absence of these scenarios, a DACA denial is not at all appropriate. Indeed, the DACA SOP suggests that arrests that do not give rise to national security or public safety threats should not be held against a DACA status applicant as long as she has disclosed those arrests in her DACA application. DACA SOP at 106.

63.   A DACA denial that requires supervisory review must conform to a ten-step process (the first seven steps of which are redacted from the publicly available DACA SOP).  DACA SOP 107.

64.   Where—as in Ms. Rueda's case—the only basis for an intended DACA status denial is, "You have not established that you warrant a favorable exercise of prosecutorial discretion," in addition to providing the DACA status applicant an NOID, supervisors must refer the case to Headquarters, Service Center Operations (HQSCOPS) through the normal chain of command for review. DACA SOP at 106.

65.   The unexplained one-line DACA status denial notice that Defendant Baran issued to Ms. Rueda does not indicate whether USCIS followed any of these mandatory procedures.  But it is certain that, despite the DACA SOP's requirements, Ms. Rueda never received an RFE, an NOID, an opportunity to respond, or an explanation for her denial.

**Ms. Rueda's Background, Community Leadership, and Political Advocacy**

66.   Ms. Rueda is the paradigmatic "Dreamer."  She was born in Mexico, but was brought to the United States as a six-year-old child and has lived and gone to school continuously here for the last 17 years.  She is pursuing a bachelor's degree in Latin American Studies with a minor in Pan-African Studies at California State University, Los Angeles.

67.   She is also a well-known leader of California's immigrants' rights movement and has been involved with the Los Angeles Immigrant Youth Coalition ("IYC") and the California Immigrant Youth Justice Alliance ("CIYJA"), organizations of undocumented youth seeking to change policy, destigmatize immigration, and empower young people to pursue their dreams regardless of their immigration status.

68.   Ms. Rueda is a community leader, educator, and activist.  She attends conferences, helped run the Los Angeles chapter of IYC, served as a logistics

21

coordinator at CIYJA, and conducts outreach and education programs for other undocumented youth, including Know Your Rights workshops.  Ms. Rueda has built relationships with local high schools, where she educates undocumented and other youth about the legal, educational, and health resources available to them, and instructs on peaceful political advocacy, protests, and civil disobedience.  Ms. Rueda also participates in the annual "Coming Out of the Shadows" event, where young people bravely come out as undocumented to raise awareness of how many undocumented people are integrated in and indispensable to our communities.

69.   Like other civil rights leaders, Ms. Rueda is a vocal and visible advocate for education, community-building, and demonstration.  She leads protests, rallies, government petitions, and media initiatives highlighting injustices in our immigration and criminal laws, and among the agencies and individuals who enforce them.

70.   When Defendants unjustly arrested and detained her mother in April 2017, Ms. Rueda garnered media attention and the backing of community and political leaders in support of her successful protest campaign to secure her mother's release.

71.   Ms. Rueda is widely recognized for a photo of her sitting peacefully, with a fist in the air, at one of her past immigration demonstrations.  When she was arrested and detained, this photo went viral on the internet, as a "Free Claudia" campaign swept across Los Angeles and supporters flooded Defendants with requests for her release.  The *Los Angeles Times* was one of the media outlets that picked up and followed the story.  *See* M. Hamilton and R. Winton, "Border Patrol detains 22-year-old Cal State L.A. student activist; her lawyer says it is retaliation," *Los Angeles Times* (May 19, 2017), *available at* http://www.latimes.com/local/education/la-essential-education-updates-southern-border-patrol-detains-22-year-old-cal-1495214955-htmlstory.html; A.

22

Castillo, "Supporters of Cal State L.A. student activist detained by Border Patrol hold silent rally on commencement day," *Los Angeles Times* (May 20, 2017), *available at* http://www.latimes.com/local/lanow/la-me-immigration-activist-05-21-story.html; S. Parvini, "Cal State L.A. student activist detained by Border Patrol is released," *Los Angeles Times* (June 9, 2017), *available at* http://www.latimes.com/local/lanow/la-me-ln-immigration-activist-arrest-20170609-story.html.

**Ms. Rueda's Unlawful and Retaliatory Seizure, Search, Arrest, and Detention**

72.   On April 24, 2017, Ms. Rueda's mother, Teresa Vidal-Jaime, was swept up as a collateral arrest during a criminal investigation of another member of their household.  Ms. Vidal-Jaime was not a person of interest in the criminal investigation, but because of her immigration status, Defendants placed her in immigration detention.

73.   Like her mother, Ms. Rueda was not a target or person of interest in the investigation.

74.   Immediately, Ms. Rueda mobilized her community in protest of her mother's unjust arrest and detention.  She led a rally before ICE and the sheriffs who raided her home; organized a letter-writing campaign to ICE and CBP; set up a call line for people to contact ICE and CBP on her mother's behalf; spoke with the media in protest of her mother's arrest; and attended the Sheriff's Civilian Oversight Commission, where she again publicly spoke out against her mother's arrest.

75.   In addition to these efforts, Ms. Rueda submitted a declaration that was served on ICE and considered by the Immigration Judge in her mother's bond hearing.

76.   On May 12, 2017, Ms. Rueda was successful in helping to secure her mother's release on bond.

77.   On May 18, 2017, days after she was reunited with her mother, plainclothes immigration officers—including Defendants Andrew K. Bolton and Daniel

23

Brightman and several Doe Defendants—snatched Ms. Rueda without warning outside of her family's home.  At approximately 7:50 a.m., still wearing her pajamas, she went outside to move her family's car for street cleaning.  Before she could move it, three unmarked vehicles surrounded her on all sides. Terrified, she got out of the car and put her hands up.  The officers surrounded her, asked her name in Spanish, handcuffed her, and put her into a white, unmarked van.  Ms. Rueda screamed for her mother.

78. The officers did not have an arrest warrant.  And at no point before or during the seizure and arrest did they identify themselves as officers of any state or federal agency, state the reason for Ms. Rueda's seizure and arrest, or tell her where she was going.  They merely asked Ms. Rueda, in Spanish, for identification, and when she answered that she did not have any on her, asked her name and took her away.

79. The officers drove Ms. Rueda to a gas station and a female officer searched her without consent.  They drove her to the Chula Vista Border Patrol Station in San Diego, where she stayed for approximately two days before being transferred to Otay Mesa.

80. The only opportunity Ms. Rueda was given to contact her family was through the Mexican consulate.  Her immigration attorney was eventually able to locate her and secure a bond hearing on June 9, 2017.  San Diego Immigration Judge Garcy determined that Ms. Rueda is not a flight risk or a public safety threat and ordered her released on her own recognizance.  The Board of Immigration Appeals upheld Immigration Judge Garcy's bond-free release order.

81. Ms. Rueda was finally released after three weeks in immigration detention, during which no immigration charges had been filed against her.

**Ms. Rueda's Unlawful and Retaliatory DACA Application Denial**

82. Days after her release, Ms. Rueda's immigration attorney submitted a DACA application on her behalf to USCIS on June 19, 2017.  Her application was

24

timely, complete, thorough, and honest.  It included the required employment authorization application and $495 filing fee.  It contained years of school attendance and achievement records; financial information; her resume; detailed descriptions and arrest records from her two encounters with law enforcement in the course of her political activities—both for peaceful protest-related misdemeanors that prosecutors did not pursue; and over a dozen letters from community and political leaders in support of her DACA application, including from United States Senator Kamala Harris and Los Angeles Mayor Eric Garcetti.

83.   Financial inability was the only reason Ms. Rueda had not previously applied for DACA status.

84.   Ms. Rueda met and continues to meet all of the objective DACA status criteria that have governed USCIS's DACA status determinations for over five years— and which DHS has repeatedly confirmed have not changed.  They include age, residency, and educational requirements, and the lack of any criminal convictions or national security or public safety threat.

85.   Ms. Rueda's DACA application reflects that she is a law-abiding and motivated young person who is on the verge of obtaining a college degree. The range of letters from community, political, and educational leaders lauding Ms. Rueda's accomplishments reflects the visibility of her activism and the positive impact of her efforts on the Los Angeles community.

86.   In addition to her accomplishments and political activism,  Ms. Rueda's DACA application also reflects her lack of any criminal history.  It honestly and accurately describes the circumstances of her two encounters with law enforcement and includes the police records reflecting the fact that prosecutors did not pursue either arrest—both of which occurred at peaceful political protests.

87. Ms. Rueda's first arrest was for "disturbing the peace" at a peaceful protest in 2012.  No charges were filed.  Her second arrest was for "trespassing" at a peaceful protest in 2015.  Charges were quickly dropped.  Both of these incidents were direct outgrowths of core protected political speech and advocacy.  Certainly, neither indicates that Ms. Rueda is or ever has been a national security or public safety threat.

88. Because neither incident resulted in a conviction, neither disqualifies Ms. Rueda from DACA status.  Indeed, neither incident even falls into the DACA SOP criteria for a "significant misdemeanor," which includes domestic violence, sexual abuse or exploitation, burglary, unlawful possession or use of a firearm, drug distribution or trafficking, and driving under the influence of alcohol or drugs.  DACA SOP at 81.

89. Under the DACA SOP, even a DACA status applicant who has been convicted of one of these significant misdemeanors must receive an NOID and 33 days to respond with "additional information, evidence, or arguments overcoming the grounds for the intended denial."   But Ms. Rueda—who has never been convicted of any crime and never even been arrested for any "significant misdemeanor"—did not receive the mandated NOID and opportunity to respond before receiving a one-line DACA denial notice with no reason or explanation.

### Effects on Ms. Rueda

90. Ms. Rueda's arrest and detention has affected her education, employment, advocacy, and mental health.

91. In the semesters following her arrest and detention, Ms. Rueda withdrew from several classes and received multiple "incompletes" on her college transcript.

92. Ms. Rueda has been unable to maintain her leadership roles and responsibilities at IYC and CIYJA because of trauma-induced stress and anxiety.

93. She has declined or backed out of public speaking engagements and advocacy commitments, something she never did before her arrest and detention.

94. Before her arrest and detention, Ms. Rueda sporadically spoke to a mental health professional, but in the months since she has been seeing one twice a month, including multiple times on an emergency basis due to the ongoing trauma, stress, and anxiety caused by Defendants' actions.  To this day, she feels like she might be followed and fears a repeat of the morning that Defendants put her in the back of a van and drove her hundreds of miles from home without reason or explanation.

**Defendants' Pattern and Practice of Adverse Immigration Actions to Intimidate Their Critics and Silence and Restrict Speech**

95. Defendants' (1) seizure and arrest of Ms. Rueda and (2) denial of her DACA status application—both in retaliation for her political speech, protests, and activism against Defendants' immigration policies and practices—are part of a recent and ongoing pattern and practice.

96. Since early 2017, Defendants have targeted immigrants' rights activists, protesters, and community organizers for adverse immigration actions as retaliation for their protected political speech—in a broad campaign of deterrence and intimidation aimed at silencing critics and restricting political speech.

97. Several examples illustrate Defendants' pattern and practice:

- In March 2017, ICE officers arrested Daniela Vargas, a 22-year-old activist and DACA recipient with a pending DACA renewal application, as she was leaving a news conference in Jackson, Mississippi where she had spoken out in favor of DACA.[13]

---

[13] P. Helsel, "Dreamer applicant arrested after calling for immigrant protection," *NBC News* (March 2, 2017), *available at* https://www.nbcnews.com/news/us-news/dreamer-applicant-arrested-after-calling-for-immigrant-protections-n727961.

- In March 2017, ICE officers arrested Jose Enrique Balcazar Sanchez and Zully Victoria Palacios Rodriguez, two leading and recognizable organizers with Migrant Justice, an immigrant workers' rights organization.[14]

- In June 2017, ICE officers arrested two other Migrant Justice activists, Yesenia Hernandez-Ramos and Esau Peche-Ventura, after they participated in a demonstration outside a Ben & Jerry's plant on behalf of immigrant dairy farm workers.[15]

- In December 2017, ICE officers initiated removal proceedings against Maru Mora Villalplando, an outspoken critic of ICE's removal and detention practices in Seattle.[16]

- In December 2017, ICE officers arrested Baltazar Aburto Gutierrez, a clam harvester in Washington State, after he was quoted in local newspapers about his girlfriend's deportation.  An ICE officer reportedly told him, "My supervisor asked me to come find you because of what appeared in the newspaper."[17]

---

[14] E. Schwartz, "Ellen Schwartz on the arrest of human rights defenders Jose Enrique Balcazar Sanchez and Zully Victoria Palacios Rodriguez," National Economic and Social Rights Initiative (March 23, 2017), *available at* https://www.nesri.org/news/2017/03/ellen-schwartz-on-the-arrest-of-human-rights-defenders-jos%C3%A9-enrique-balcazar-sanchez-and-zully-victoria-palacios.

[15] E. Murray, "Protesters decry farmworkers' arrest after Ben & Jerry's march," *Burlington Free Press* (June 19, 2017), *available at* https://www.burlingtonfreepress.com/story/news/local/vermont/2017/06/19/border-patrol-arrests-2-immigrants-east-franklin/408333001/.

[16] M. Sacchetti & D. Weigel, "ICE has detained or deported prominent immigration activists," *Washington Post* (Jan. 19, 2018), *available at* https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreigners-who-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html?utm_term=.09b9ffd93805.

[17] N. Shapiro, "ICE tracks down immigrant who spoke to media in SW Washington: 'You are the one from the newspaper,'" *Seattle Times* (Dec. 3, 2017), *available at* https://www.seattletimes.com/seattle-news/ice-tracks-down-immigrant-who-spoke-to-media-in-sw-washington-you-are-the-one-from-the-newspaper/.

---

28

- In January 2018, ICE officers in Colorado arrested Eliseo Jurado after his wife publicly took sanctuary in a church to avoid deportation to Peru.[18]

- In January 2018, Amer Othman Adi, a 57-year-old Cleveland deli owner, began a hunger strike while in ICE custody.  As his case drew media attention, United States Rep. Tim Ryan introduced a private bill to allow him to remain in the country.  The bill passed the House Judiciary Committee, but ICE officers deported him to Jordan before it could become law, in what Rep. Ryan called "a highly irregular rebuke of Congressional authority by ICE . . . [to] rip[] [Adi] from his four daughters, his wife, and the country that he has called home for over thirty years."[19]

98.    Indeed, at least two lawsuits are currently challenging Defendants' blatantly unconstitutional retaliatory practices.  *Northwest Detention Center Resistance v. ICE*, 2:18-cv-1558 (W.D. Wash., filed Oct. 23, 2018); *Ragbir v. Homan*, 1:18-cv-1159 (S.D.N.Y., filed Feb. 9, 2018).

99.    So too here.  Defendants would not have seized, searched, arrested, and detained Ms. Rueda or denied her DACA status application (particularly in such egregiously unlawful ways) were it not for her vocal and visible immigrants' rights activism on behalf of California's immigrant communities and in support of her mother.

---

[18] J. Bear & J. Fields, "Husband of Peruvian woman taking sanctuary at Boulder church detained by ICE," *The Denver Post* (Jan. 11, 2018), *available at* https://www.denverpost.com/2018/01/11/ingrid-encalada-latorre-husband-detained-immigration-boulder-sanctuary/.

[19] "Youngstown businessman Amer Othman Adi deported to Jordan," Cleveland.com (Jan. 30, 2018), *available at* https://www.cleveland.com/metro/index.ssf/2018/01/youngstown_businessman_amer_ot.html.

## CAUSES OF ACTION

### COUNT ONE
### Administrative Procedure Act
### Arbitrary and Capricious Action

100. Ms. Rueda repeats and incorporates by reference each and every preceding allegation as if fully set forth herein.

101. This Count is brought against DHS; USCIS; ICE; USCIS Director Cissna, in his official capacity; and USCIS California Service Center Director Baran, in her official capacity.

102. This Count seeks declaratory and injunctive relief under the APA.

103. The denial of Ms. Rueda's DACA application constitutes a final agency action.

104. Under the APA, this Court "shall compel agency action unlawfully withheld or unreasonably delayed[,] and hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right . . .; [or] without observance of procedure required by law."  5 U.S.C. § 706(1)-(2).

105. This Court must set aside agency action that (2) is done without reason or explanation; (2) fails to abide by the agency's own binding policies or procedures; (3) is an unexplained or irrational departure from past practice; (4) is pursuant to an unwritten policy that contradicts a binding written one; or (5) is retaliatory.

106. An agency must provide "reasoned explanation[s]" for its actions.  *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009).  An agency action is arbitrary and capricious if the agency gives no reason for its action.  *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008).

107. An agency's failure to follow its own policies or procedures is a sufficient ground to set aside its action.  *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

30

108.   An agency action may be set aside as arbitrary and capricious if there is an unexplained inconsistency between the agency's actions, or upon a showing that analogous cases have been decided differently.  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *Cal. Pub. Utils. Comm'n v. Fed. Energy Reg. Comm'n*, 879 F.3d 966, 978 (9th Cir. 2018).

109.   An agency may not "depart from prior policy *sub silentio* or simply disregard rules that are still on the books."  *FCC*, 556 U.S. at 515.  It may not adopt or follow an unwritten or unconstitutional policy that conflicts with a written one.  *Aracely v. Nielsen*, 319 F. Supp. 3d 110 (D.D.C. July 3, 2018).

110.   Defendants' unexplained and irrational denial of Ms. Rueda's DACA application—in violation of the DACA status criteria and the DACA SOP policies and procedures, in retaliation for her constitutionally protected political speech—is arbitrary and capricious.  Defendants ignored their established policies and procedures for processing and evaluating DACA applications by failing to issue either an RFE or an NOID and failing to give Ms. Rueda the opportunity to provide additional evidence or otherwise respond.

111.   Defendants then gave no "reasoned explanation"—or any explanation—for the denial of her DACA application.  The failure to issue an RFE or NOID and the denial of Ms. Rueda's DACA application itself are unexplained and irrational departures from Defendants' years of past practice of approving DACA applications for individuals who meet the objective DACA status criteria (or at least issuing a pre-denial RFE and/or NOID and providing an opportunity to respond).

112.   This Court has jurisdiction to review Defendants' compliance with the binding and non-discretionary policies and procedures of the DACA program and the DACA SOP.  *Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *2 (C.D. Cal. Feb. 26, 2018); *Ramirez Medina v. DHS*, 313 F.

31

Supp. 3d 1237, 1244 (W.D. Wash. 2018); *Gonzalez Torres v. DHS*, 2017 WL 4340385, at \*4-6 (S.D. Cal. Sept. 29, 2017); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1334 (N.D. Ga. 2017).

113. For these independently and cumulatively sufficient reasons, the denial of Ms. Rueda's DACA application violates the APA and must be set aside as arbitrary, capricious, an abuse of discretion, and contrary to law.

114. USCIS must fully and appropriately evaluate Ms. Rueda's DACA application in accordance with the DACA SOP, the APA, the Fifth Amendment, and the First Amendment—*i.e.*, without departure from longstanding DACA policies and procedures, including the DACA Memo's DACA status criteria and the DACA SOP's RFE, NOID, and opportunity to respond requirements; without consideration of Ms. Rueda's protected speech or other political activity; and without any allegation or assertion that she is an enforcement priority or poses a public safety threat—which an Immigration Judge has determined she does not (a determination upheld by the BIA). *See Ramirez Medina v. DHS*, 313 F. Supp. 3d 1237, 1249-52 (W.D. Wash. 2018) (with respect to the evaluation of the plaintiff's DACA status, ordering on the basis of an Immigration Judge's finding: "USCIS is enjoined from asserting, adopting, or relying in any proceedings on any statement or record made as of this date purporting to allege or establish that [the plaintiff] is a gang member, gang affiliated, or a threat to public safety").

## COUNT TWO
### Administrative Procedure Act
### Unconstitutional Action

115. Ms. Rueda repeats and incorporates by reference each and every preceding allegation as if fully set forth herein.

116. This Count is brought against DHS; USCIS; ICE; USCIS Director Cissna, in his official capacity; and USCIS California Service Center Director Baran, in her official capacity.

32

117. This Count seeks declaratory and injunctive relief under the APA.

118. The denial of Ms. Rueda's DACA application constitutes a final agency action.

119. Under the APA, this Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right [or] without observance of procedure required by law." 5 U.S.C. § 706(2).

120. Defendants' denial of Ms. Rueda's DACA application violated the Fifth Amendment's guarantee of procedural due process by failing to adhere to binding policies and procedures. Defendants' departure from their established policies and procedures for processing and evaluating DACA applications by failing to issue either an RFE or an NOID and failing to give Ms. Rueda the opportunity to provide additional evidence or otherwise respond violated her right to due process.

121. Defendants' denial of Ms. Rueda's DACA application also violated the First Amendment's prohibition against adverse government action done in retaliation for constitutionally protected political speech and advocacy. It is part of Defendants' pattern and practice of targeting immigrants' rights activists, protesters, and community organizers for adverse immigration actions as retaliation for their protected political speech—in a broad campaign of deterrence and intimidation aimed at silencing critics and restricting political speech.

122. Defendants' policy and process must be rational and conform to constitutional procedural due process and free speech guarantees. *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) ("[F]ederal officials do not possess discretion to violate constitutional rights.").

123. For these independently and cumulatively sufficient reasons, the denial of Ms. Rueda's DACA application violates the APA and must be set aside as arbitrary, capricious, an abuse of discretion, and contrary to law.

124. USCIS must fully and appropriately evaluate Ms. Rueda's DACA application in accordance with the DACA SOP, the APA, the Fifth Amendment, and the First Amendment—*i.e.*, without departure from longstanding DACA policies and procedures, including the DACA Memo's DACA status criteria and the DACA SOP's RFE, NOID, and opportunity to respond requirements; without consideration of Ms. Rueda's protected speech or other political activity; and without any allegation or assertion that she is an enforcement priority or poses a public safety threat—which an Immigration Judge has determined she does not (a determination upheld by the BIA). *See Ramirez Medina v. DHS*, 313 F. Supp. 3d 1237, 1249-52 (W.D. Wash. 2018) (with respect to the evaluation of the plaintiff's DACA status, ordering on the basis of an Immigration Judge's finding: "USCIS is enjoined from asserting, adopting, or relying in any proceedings on any statement or record made as of this date purporting to allege or establish that [the plaintiff] is a gang member, gang affiliated, or a threat to public safety").

**COUNT THREE**
***Bivens* Claim**
**Fourth Amendment (Unlawful Seizure and Arrest)**

125. Ms. Rueda repeats and incorporates by reference each and every preceding allegation as if fully set forth herein.

126. This Count is brought against Defendants Bolton and Brightman and a currently unknown number of Doe Defendants who directed, initiated, or conducted Ms. Rueda's unlawful and retaliatory seizure, search, and arrest, all in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

127. This Count seeks declaratory relief and damages in an amount to be proven.

128. The Fourth Amendment prohibits unreasonable searches, seizures, and arrests. All persons, including aliens, are entitled to Fourth Amendment protection from unlawful seizures, searches, and arrests. *Orhorhaghe v. INS*, 38 F.3d 488,

34

497-501 (9th Cir. 1994); *Benitez-Mendez v. INS*, 760 F.2d 907, 909 (9th Cir. 1983).

129.   A seizure occurs when a reasonable person, considering the totality of the circumstances, would not feel "free to decline the officers' requests or otherwise terminate the encounter." *Sanchez v. Sessions*, 870 F.3d 901, 909 (9th Cir. 2017) (quoting *Florida v. Bostick*, 501 U.S. 429, 438 (1991)). "When an encounter between a law [enforcement officer] and another person escalates to the point where it is considered a 'seizure,' the officer must have a reasonable, articulable basis for his actions." *Id.* (quoting *Orhorhaghe*, 38 F.3d at 494).

130.   To support a warrantless seizure and arrest for a civil immigration violation, an immigration officer must be aware of sufficient articulable facts to provide a reasonable suspicion that a person is in the United States illegally. *Benitez-Mendez*, 760 F.2d at 909. Absent these circumstances, a warrantless seizure and arrest violates the Fourth Amendment. *Orhorhaghe*, 38 F.3d at 497-501.

131.   An immigration officer may not make a warrantless arrest unless the officer "has reason to believe that the person is likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii).

132.   A person arrested by an immigration officer without a warrant must be "advised of the reasons for his or her arrest[,] the right to be represented at no expense to the Government[, and] . . . that any statement made may be used against him or her in a subsequent proceeding." 8 C.F.R. § 287.3(c).

133.   An immigration officer may briefly detain a person only if the officer "has reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(b)(2).

134.   Even if the arresting officers have an arrest warrant, they are still obligated to follow the regulations governing their conduct. Thus, an immigration officer

35

"shall, as soon as it is practical and safe to do so, [i]dentify himself or herself as an immigration officer who is authorized to execute an arrest[,] and [s]tate that the person is under arrest and the reason for the arrest."  8 C.F.R. § 287.8(c)(2)(iii).

135. An immigration officer is "prohibited" from the "use of threats, coercion, or physical abuse . . . to induce a suspect to waive his or her rights or to make a statement."  8 C.F.R. § 287.8(c)(2)(vii).

136. Defendants did not comply with any of these binding regulations when they surrounded Ms. Rueda without a warrant or reasonable suspicion, did not identify themselves as officers of any state or federal agency, did not state the reason for Ms. Rueda's seizure and arrest, or tell her where she was going, and frightened and coerced her into identifying herself.

137. Because Defendants merely asked Ms. Rueda her name in Spanish and, when she answered, took her away, they did not have any "articulable facts" giving rise to a "reasonable suspicion" that Ms. Rueda was "engaged in an offense against the United States or [] an alien illegally in the United States."  *Sanchez*, 870 F.3d at 912-13 (racial profiling is not reasonable suspicion).

138. And even if any such articulable facts and reasonable suspicion could have existed, Defendants were not permitted to arrest Ms. Rueda without a warrant because they had absolutely no "reason to believe" the she was "likely to escape before a warrant [could have been] obtained."

139. Defendants failed to comply with their binding regulations.  Because these regulations are intended to "preserve [an individual's] privacy and protect [her] from racial profiling," they are "mandated by the Fourth Amendment."  *Sanchez*, 870 F.3d at 912-13; *see also Bong Youn Choi v. Barber*, 289 F.2d 642, 646 (9th Cir. 1960) (immigration officials must abide by "traditional standards of fairness encompassed in due process of law").  Defendants' non-compliance violated Ms. Rueda's Fourth Amendment rights.

140. This Court has jurisdiction over Ms. Rueda's Fourth Amendment claims because the actions at issue here occurred before any Immigration Court removal proceedings had commenced against Ms. Rueda. *See Samayoa-Martinez v. Holder*, 558 F.3d 897, 901 (9th Cir. 2009) ("Formal removal proceedings do not commence until the [government] has filed an NTA in the immigration court."). Whether Defendants complied with their binding regulations and the mandates of the Fourth Amendment is properly within the purview of this Court.

141. Each of the individual Defendants was personally involved in and proximately caused the violations of Ms. Rueda's constitutional rights.

142. As a result of Defendants' actions, Ms. Rueda suffered damages, including but not limited to loss of liberty, loss of earnings and earning capacity, loss of schooling, loss of valuable benefits, distress, humiliation, embarrassment, discomfort, fear, anxiety, and other injuries.

**COUNT FOUR**
***Bivens* Claim**
**Fifth Amendment (Procedural Due Process)**

143. Ms. Rueda repeats and incorporates by reference each and every preceding allegation as if fully set forth herein.

144. This Count is brought against Defendant Baran and a currently unknown number of Doe Defendants who directed, initiated, or issued Ms. Rueda's unlawful and retaliatory DACA status denial notice, all in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

145. This Count seeks declaratory relief and damages in an amount to be proven.

146. The Fifth Amendment guarantees due process of law. All persons, including aliens, who are physically present in the United States are guaranteed the protections of the Due Process Clause. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

37

147. Defendants violated Ms. Rueda's right to due process by failing to comply with the binding policies and procedures of the DACA program and the DACA SOP by failing to provide Ms. Rueda a Request for Evidence or Notice of Intend to Deny—and opportunity to respond—before issuing her an unreasoned and unexplained DACA status denial notice. *See Bong Youn Choi v. Barber*, 289 F.2d 642, 646 (9th Cir. 1960) (immigration officials must abide by "traditional standards of fairness encompassed in due process of law").

148. Each of the individual Defendants was personally involved in and proximately caused the violations of Ms. Rueda's constitutional rights.

149. As a result of Defendants' actions, Ms. Rueda suffered damages, including but not limited to loss of liberty, loss of earnings and earning capacity, loss of schooling, loss of valuable benefits, distress, humiliation, embarrassment, discomfort, fear, anxiety, and other injuries.

**COUNT FIVE**
***Bivens* Claim**
**First Amendment (Retaliatory Seizure and Arrest)**

150. Ms. Rueda repeats and incorporates by reference each and every preceding allegation as if fully set forth herein.

151. This Count is brought against Defendants Bolton and Brightman and a currently unknown number of Doe Defendants who directed, initiated, or conducted Ms. Rueda's unlawful and retaliatory seizure, search, and arrest, all in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

152. This Count seeks declaratory relief and damages in an amount to be proven.

153. The First Amendment prohibits adverse government action in retaliation for constitutionally protected political speech and advocacy. *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Wilkie v. Robbins*, 551 U.S. 537, 555 (2007) ("the Government may not retaliate for exercising First Amendment speech rights"). Accordingly, government actions "that fall short of a direct prohibition against

38

the exercise of First Amendment rights" still violate the Constitution. *Laird v. Tatum*, 408 U.S. 1, 11 (1972). A plaintiff may bring a First Amendment retaliatory arrest claim even if there was probable cause for the arrest by alleging that the retaliatory arrest was the product of "the existence and enforcement of an official policy motivated by retaliation." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954-55 (2018).

154. A First Amendment retaliation claim requires a showing that (1) the plaintiff was engaged in a constitutionally protected activity; (2) the plaintiff was subjected to an adverse government action that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a causal relationship between the plaintiff's constitutionally protected activity and the adverse government action. *Blair v. Bethel School District*, 608 F.3d 540, 543 (9th Cir. 2010). The governmental defendant's knowledge of the plaintiff's engagement in the constitutionally protected activity, as well as the temporal proximity of the constitutionally protected activity and the adverse government action, are probative of a causal relationship. *Coszalter v. City of Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003) (recognizing three to eight months as supporting an inference of retaliation).

155. Ms. Rueda's protests and activism against Defendants' immigration policies and practices generally, and against her mother specifically, are core political speech on matters of public concern and the "stewardship of public officials" that "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *NY Times Co. v. Sullivan*, 376 U.S. 254, 274-75 (1964); *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

156. Defendants were aware of Ms. Rueda's constitutionally protected protests and activism against their immigration policies and practices generally, and against her mother specifically. Ms. Rueda spoke publicly and vocally, organized directed campaigns targeting Defendants, and had garnered media attention and

39

the backing of prominent political and community leaders.  When Defendants unjustly arrested and detained her mother in April 2017, Ms. Rueda organized a letter-writing campaign to ICE and CBP, set up a call line for people to contact ICE and CBP on her mother's behalf, and spoke with the media in protest of her mother's arrest.  Defendants then seized, arrested, searched, and detained Ms. Rueda within weeks—and only days after Ms. Rueda had helped secure her mother's release from detention.

157.   As explained, *supra*, Defendants' seizure, search, arrest, and detention of Ms. Rueda was without reasonable suspicion or probable cause (in violation of Defendants' binding regulations and the Fourth Amendment).  But even if Defendants could show probable cause for the seizure and arrest, Ms. Rueda is still constitutionally aggrieved by the causal relationship between her constitutionally protected activity and the adverse government action because it was the product of "the existence and enforcement of an official policy motivated by retaliation." *Lozman*, 138 S. Ct. at 1954-55.  Indeed, it was the product of Defendants' broader pattern and practice of targeting immigrants' rights activists, protesters, and community organizers for adverse immigration actions as retaliation for their protected political speech—in a broad campaign of deterrence and intimidation aimed at silencing critics and restricting political speech.

158.   Each of the individual Defendants was personally involved in and proximately caused the violations of Ms. Rueda's constitutional rights.

159.   As a result of Defendants' actions, Ms. Rueda suffered damages, including but not limited to loss of liberty, loss of earnings and earning capacity, loss of schooling, loss of valuable benefits, distress, humiliation, embarrassment, discomfort, fear, anxiety, and other injuries.

**COUNT SIX**
*Bivens* **Claim**
**First Amendment (Retaliatory DACA Status Denial)**

160. Ms. Rueda repeats and incorporates by reference each and every preceding allegation as if fully set forth herein.

161. This Count is brought against Defendant Baran and a currently unknown number of Doe Defendants who directed, initiated, or issued Ms. Rueda's unlawful and retaliatory DACA status denial notice, all in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

162. This Count seeks declaratory relief and damages in an amount to be proven.

163. The First Amendment prohibits adverse government action in retaliation for constitutionally protected political speech and advocacy. *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Wilkie v. Robbins*, 551 U.S. 537, 555 (2007) ("the Government may not retaliate for exercising First Amendment speech rights"). Accordingly, government actions "that fall short of a direct prohibition against the exercise of First Amendment rights" still violate the Constitution. *Laird v. Tatum*, 408 U.S. 1, 11 (1972).

164. A First Amendment retaliation claim requires a showing that (1) the plaintiff was engaged in a constitutionally protected activity; (2) the plaintiff was subjected to an adverse government action that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a causal relationship between the plaintiff's constitutionally protected activity and the adverse government action. *Blair v. Bethel School District*, 608 F.3d 540, 543 (9th Cir. 2010). The governmental defendant's knowledge of the plaintiff's engagement in the constitutionally protected activity, as well as the temporal proximity of the constitutionally protected activity and the adverse government action, are probative of a causal relationship. *Coszalter v. City of*

41

*Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003) (recognizing three to eight months as supporting an inference of retaliation).

165. Ms. Rueda's protests and activism against Defendants' immigration policies and practices generally, and against her mother specifically, are core political speech on matters of public concern and the "stewardship of public officials" that "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *NY Times Co. v. Sullivan*, 376 U.S. 254, 274-75 (1964); *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

166. Defendants were aware of Ms. Rueda's constitutionally protected protests and activism against their immigration policies and practices generally, and against her mother specifically. Ms. Rueda spoke publicly and vocally, organized directed campaigns targeting Defendants, and had garnered media attention and the backing of prominent political and community leaders. When Defendants unjustly arrested and detained her mother in April 2017, Ms. Rueda organized a letter-writing campaign to ICE and CBP, set up a call line for people to contact ICE and CBP on her mother's behalf, and spoke with the media in protest of her mother's arrest. She helped secure her mother's release from detention.

167. In the weeks and months that followed Ms. Rueda's protests, activism, and vocal criticism of immigration officials, practices, and policies, Defendants ignored their own binding DACA status criteria and the non-discretionary policies and procedures of the DACA SOP to issue Ms. Rueda an unreasoned and irrational DACA status denial notice—without issuing a Request for Evidence or Notice of Intend to Deny, as required by the DACA SOP. Indeed, Defendants departed from years of USCIS's past practice of approving DACA status for individuals who meet the objective DACA status criteria (or at least issuing a pre-denial RFE and/or NOID and providing an opportunity to respond). Ms. Rueda met and continues to meet those criteria.

168.   Because the only discernible difference between Ms. Rueda and the hundreds of thousands of others who have been approved for DACA status is her political speech and activism against Defendants' immigration practices, Defendants' departure from the DACA program's binding policies and procedures and from USCIS's past practice violated the First Amendment's prohibition against retaliation for political speech.  Indeed, it was the product of Defendants' broader pattern and practice of targeting immigrants' rights activists, protesters, and community organizers for adverse immigration actions as retaliation for their protected political speech—in a broad campaign of deterrence and intimidation aimed at silencing critics and restricting political speech.

169.   Each of the individual Defendants was personally involved in and proximately caused the violations of Ms. Rueda's constitutional rights.

170.   As a result of Defendants' actions, Ms. Rueda suffered damages, including but not limited to loss of liberty, loss of earnings and earning capacity, loss of schooling, loss of valuable benefits, distress, humiliation, embarrassment, discomfort, fear, anxiety, and other injuries.

**COUNT SEVEN**
*Bivens* **Claim**
**Fifth Amendment (Equal Protection)**

171.   Ms. Rueda repeats and incorporates by reference each and every preceding allegation as if fully set forth herein.

172.   This Count is brought against Defendant Baran and a currently unknown number of Doe Defendants who directed, initiated, or issued Ms. Rueda's unlawful and retaliatory DACA status denial notice, all in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

173.   This Count seeks declaratory relief and damages in an amount to be proven.

43

174. The Fifth Amendment guarantees equal protection under the law.  A plaintiff may maintain an equal protection violation as a "class of one" by alleging that she has irrationally or discriminately been treated differently from others similarly situated, regardless of the "subjective motivation" of the different treatment.  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000).

175. Ms. Rueda is similarly situated to the hundreds of thousands of others that USCIS has approved for DACA status.  She meets all of the objective DACA status criteria—including the lack of a criminal history and the lack of a national security or public safety threat, as determined by an Immigration Judge and upheld by the Board of Immigration Appeals.  And between 2012 and 2017, USCIS had "not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion."

176. Defendants' departure from their years-long practice of approving DACA status for individuals who meet the objective DACA status criteria (or at least issuing a pre-denial RFE and/or NOID and providing an opportunity to respond) is either intentionally aimed at harming Ms. Rueda, or it is an unexplained departure from written policies and procedures and established practices.  Either way, it is "irrational and wholly arbitrary," in violation of the Fifth Amendment guarantee of equal protection under the law.  *Village of Willowbrook*, 528 U.S. at 565.

177. Each of the individual Defendants was personally involved in and proximately caused the violations of Ms. Rueda's constitutional rights.

178. As a result of Defendants' actions, Ms. Rueda suffered damages, including but not limited to loss of liberty, loss of earnings and earning capacity, loss of schooling, loss of valuable benefits, distress, humiliation, embarrassment, discomfort, fear, anxiety, and other injuries.

44

## COUNT EIGHT
### Declaratory Judgment
### All Causes of Action

179. Ms. Rueda repeats and incorporates by reference each and every preceding allegation as if fully set forth herein.

180. For the reasons set forth above, Ms. Rueda seeks a declaration that Defendants have violated the DACA SOP; the APA; the Fifth Amendment; 8 C.F.R. §§ 287.3 and 287.8; the Fourth Amendment; and the First Amendment.

## DEMAND FOR JURY TRIAL

181. Ms. Rueda demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

Wherefore, Ms. Rueda prays that this Court grant the following relief:

1. Award damages according to proof;

2. Issue a declaratory judgment that Defendants have violated the DACA SOP; the APA; the Fifth Amendment; 8 C.F.R. §§ 287.3 and 287.8; the Fourth Amendment; and the First Amendment;

3. Set aside the denial of Ms. Rueda's DACA application;

4. Require USCIS to fully and appropriately evaluate Ms. Rueda's DACA application in accordance with the DACA SOP, the APA, the Fifth Amendment, and the First Amendment—*i.e.*, without departure from longstanding DACA policies and procedures, including the DACA Memo's DACA status criteria and the DACA SOP's RFE, NOID, and opportunity to respond requirements; without consideration of Ms. Rueda's protected speech or other political activity; and without any allegation or assertion that she is an enforcement priority or poses a public safety threat;

5. Declare that USCIS may not deny Ms. Rueda's DACA application in the absence of strict compliance with the DACA SOP and a reasoned, written finding by the appropriate office of DHS that she is a public safety threat or

national security threat, or that granting her DACA status would be inconsistent with DHS's enforcement priorities, as defined by the DACA Memo;

6.     Award Ms. Rueda reasonable costs and attorneys' fees; and

7.     Grant any other and further relief that this Court may deem fit and proper.

Dated: October 30, 2018        Respectfully submitted,

/s/ John C. Ulin
ARNOLD & PORTER KAYE SCHOLER LLP
JOHN C. ULIN (SBN 165524)
john.ulin@arnoldporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
T: (213) 243-4000
F: (213) 243-4199

JABA TSITSUASHVILI (SBN 309012)
jaba.tsitsuashvili@arnoldporter.com
601 Massachusetts Avenue NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999

Attorneys for Plaintiff
CLAUDIA SARAHI RUEDA VIDAL

46