1
2
3
4
5

ARNOLD & PORTER KAYE SCHOLER LLP
John C. Ulin (SBN 165524)
john.ulin@arnoldporter.com
Oscar Ramallo (SBN 241487)
oscar.ramallo@arnoldporter.com
Vanessa Adriance (SBN 247464)
vanessa.adriance@arnoldporter.com

6
7
8
9

777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
T: (213) 243-4000
F: (213) 243-4199

10
11

*Attorneys for Plaintiff*
Claudia Sarahi Rueda Vidal

12

13
14

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

15
16
17
18
19
20
21
22
23

CLAUDIA SARAHI RUEDA VIDAL,

Plaintiff,

vs.

U.S. DEPARTMENT OF HOMELAND
SECURITY; et al.,

Defendants.

No. 2:18-cv-09276-DMG (PLAx)

**PLAINTIFF CLAUDIA RUEDA'S
MEMORANDUM OF POINTS
AND AUTHORITIES IN
SUPPORT OF HER MOTION FOR
SUMMARY JUDGMENT**

Judge:  Hon. Dolly M. Gee
Courtroom:  8C
Hearing:  June 12, 2020
Time:  9:30 a.m.

24
25
26
27
28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ...................................................................................3

    A.   The DACA Program.................................................................3

    B.   Defendants' Animus Towards Immigration Activists ...................4

    C.   Rueda's Activism and Service to Her Community ........................5

    D.   Defendants' Arrest, Detention, and Pretextual Denial of Rueda's DACA Application ................................................................6

ARGUMENT ......................................................................................................7

I.   PUNISHING RUEDA FOR HER PARENTS' ALLEGED WRONGDOING VIOLATES EQUAL PROTECTION AND FREEDOM OF ASSOCIATION...........................................................................7

    A.   Strict scrutiny applies because the Government's DACA denial interferes with a fundamental right. ............................10

    B.   The Government's DACA denial is not narrowly tailored to advance a compelling interest. ...............................................12

    C.   The Government's unconstitutional DACA denial exceeds the limits of judicial deference. ...................................................15

II.   PUNISHING RUEDA FOR HER PARENT'S ALLEGED WRONGDOING VIOLATES SUBSTANTIVE DUE PROCESS....................19

III.   DEFENDANTS VIOLATED THE FIRST AMENDMENT BY DENYING RUEDA'S DACA APPLICATION BASED ON HER PROTECTED SPEECH AND PETITIONING ACTIVITY..............................20

CONCLUSION.................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
    70 F.3d 1045 (9th Cir. 1995) ............................................................ 16, 18

*Bernal v. Fainter*,
    467 U.S. 216 (1984) ................................................................................ 14

*Blair v. Bethel Sch. Dist.*,
    608 F.3d 540 (9th Cir. 2010) ................................................................. 20

*Byrd v. Guess*,
    137 F.3d 1126 (9th Cir.1998) ................................................................... 8

*CASA de Maryland, Inc. v. Trump*,
    355 F. Supp. 3d 307 (D. Md. 2018) ................................................. 16, 17

*Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of New York*,
    502 F.3d 136 (2d Cir. 2007) ..................................................................... 8

*Clark v. Jeter*,
    486 U.S. 456 (1988) ................................................................................ 13

*Cosaltzer v. City of Salem*,
    320 F.3d 968 (9th Cir. 2003) ................................................................. 24

*Crowe v. Cy. of San Diego*,
    608 F.3d 406 (9th Cir. 2010) ................................................................. 19

*Curnow by and Through Curnow v. Ridgecrest Police*,
    952 F.2d 321 (9th Cir.1991) ............................................................... 8, 19

*Doe v. Trump*,
    288 F. Supp. 3d 1045 (W.D. Wash. 2017) ............................................. 17

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ................................................................................ 14

*Elfbrandt v. Russell*,
    384 U.S. 11 (1966) .................................................................................. 12

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

*Farmer v. Las Vegas Metro. Police Dep't*,
    No. 218CV00860GMNVCF, 2019 WL 4777312 (D. Nev. Sept. 30,
    2019) ............................................................................................................. 9

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ............................................................................... 17, 18

*Hartman v. Moore*,
    547 U.S. 250 (2006) ............................................................................... 20, 25

*Hollander v. Rainier Sch. Dist.*,
    No. 3:11-CV-01200-HU, 2013 WL 1193888 (D. Or. Mar. 22, 2013) .................. 19

*Honolulu Weekly, Inc. v. Harris*,
    298 F.3d 1037 (9th Cir. 2002) ................................................................. 7, 8

*Jimenez v. Weinberger*,
    417 U.S. 628 (1974) ................................................................................... 13

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951) ................................................................................... 19

*Kelson v. City of Springfield*,
    767 F.2d 651 (9th Cir.1985) ........................................................................ 8

*Kerby v. Sheridan*,
    No. 2:12-CV-00544-MO, 2015 WL 1004427 (D. Or. Mar. 5, 2015) .................. 19

*Khouzam v. Hogan*,
    529 F. Supp. 2d 543 (M.D. Pa. 2008) ......................................................... 18

*King v. Smith*,
    392 U.S. 309 (1968) ................................................................................... 13

*Kipps v. Caillier*,
    197 F.3d 765 (5th Cir. 1999) ..................................................................... 10

*Kipps v. Caillier*,
    205 F.3d 203 (5th Cir. 2000) ............................................................... 10, 11

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ................................................................................... 18

*Korematsu v. United States*,
    323 U.S. 214 (1944) ....................................................................... 12, 13, 14

iii

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir.2001) ................................................................ 8, 10

*Lopez-Valenzuela v. Arpaio*,
    770 F.3d 772 (9th Cir. 2014) (*en banc*) ................................................ 8

*Mendia v. Garcia*,
    No. 10-CV-03910-MEJ, 2016 WL 2654327 (N.D. Cal. May 10,
    2016) .................................................................................................. 20

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) ............................................................................. 8

*Moore v. City of E. Cleveland*,
    431 U.S. 494 (1977) ...................................................................... 10, 11

*Ms. L. v. ICE*,
    302 F. Supp. 3d 1149 (S.D. Cal. 2018) ................................................ 19

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ............................................................................ 12

*NAACP v. DHS*,
    364 F. Supp. 3d 568 (D. Md. 2019) ...................................................... 17

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019) ........................................................................ 21

*Plyler v. Doe*,
    457 U.S. 202 (1982) ..................................................................... *passim*

*Ragbir v. Homan*,
    923 F.3d 53 (2d Cir. 2019) ................................................................... 1

*Ramos v. Nielsen*,
    321 F. Supp. 3d 1083 (N.D. Cal. 2018) ............................................... 18

*Ramos v. Nielsen*,
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) ............................................... 16

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ......................................................................... 8

*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*,
    908 F.3d 476 (9th Cir. 2018) ................................................................ 4

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

*Rentz v. Spokane Cty.*,
No. CV-05-83-AAM, 2006 WL 8437720 (E.D. Wash. Aug. 4, 2006) ................... 9

*Reyes v. Cty. of San Joaquin*,
No. CIVS040428FCDPANPS, 2005 WL 2105030 (E.D. Cal. Aug.
31, 2005) .................................................................................................... 8

*Rosenbaum v. Washoe Cty.*,
663 F.3d 1071 (9th Cir. 2011) ..................................................................... 19

*Smith v. City of Fontana*,
818 F.2d 1411 (9th Cir.1987) .................................................................. 8, 10

*Smith v. Pierce Cty.*,
218 F. Supp. 3d 1220 (W.D. Wash. 2016) .................................................... 9

*Spirit of Aloha Temple v. Cty. of Maui*,
409 F. Supp. 3d 889 (D. Haw. 2019)............................................................. 7

*St. Ann v. Palisi*,
495 F.2d 423 (5th Cir. 1974) ...................................................................... 14

*Strandberg v. City of Helena*,
791 F.2d 744 (9th Cir.1986) .......................................................................... 8

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
100 F.3d 1443 (9th Cir. 1996) .................................................................... 21

*Troxel v. Granville*,
530 U.S. 57 (2000).......................................................................................... 8

*Trump v. Hawaii*,
138 S.Ct. 2392 (2018)............................................................................. 12, 16

*Valdez v. City of Phoenix*,
No. CV-18-0921-PHX-DGC, 2019 WL 5390508 (D. Ariz. Oct. 22,
2019) .......................................................................................................... 10

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) ............................................................... 15, 16

*Webster v. Doe*,
486 U.S. 592 (1988)...................................................................................... 16

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

*Wolff v. McDonnell*,
   418 U.S. 539 (1974)................................................................................20

*Zablocki v. Redhail*,
   434 U.S. 374 (1978)...........................................................................8, 11

*Zion v. Cty. of Orange*,
   874 F.3d 1072 (9th Cir. 2017) ................................................................8

## **Other Authorities**

8 C.F.R. § 274a.12(c)....................................................................................3

Fed. R. Civ. P. 56(c)(4)...............................................................................23

The Federalist No. 43 (James Madison) (Henry Cabot Lodge ed., New
   York, G.P. Putnam's Sons 1888)...........................................................13

U.S. Const., Art. III, § 3.............................................................................13

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

**INTRODUCTION**

Plaintiff Claudia Sarahi Rueda Vidal ("Rueda") respectfully requests that the Court grant summary judgment in her favor on Count Two of her First Amended Complaint (Dkt. No. 35) against Defendants U.S. Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"); U.S. Customs and Border Protection ("CBP"); and U.S. Border Patrol ("USBP") (collectively, "Defendants" or "the Government") and set aside the denial of her Deferred Action for Childhood Arrivals ("DACA") application.

In denying Defendants' motion to dismiss, this Court ruled that Rueda has a "substantial interest in avoiding deportation based on [her] … association with her family," and that Defendants must satisfy strict scrutiny to justify an invasion of that interest.  Dkt. No. 48, at 11 (quoting *Ragbir v. Homan*, 923 F.3d 53, 72 (2d Cir. 2019).  The complete administrative record before the Court confirms that Defendants' stated reason for denying her DACA application is Rueda's association with her family, and not any alleged misconduct on her own part, thus triggering strict scrutiny.  Defendants accuse Rueda's parents of being part of a criminal organization.  CAR 0124.  Although Defendants concede "there is no evidence [Rueda] has ever been directly involved in her parents' [alleged] operation," they classify her as an associate of a criminal organization "by virtue of familial relation." *Id.*

The Government cannot meet its strict scrutiny obligation by impugning a child with the alleged guilt of her parent.  To the contrary, government action "directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice."  *Plyler v. Doe*, 457 U.S. 202, 220 (1982). The Government's "illogical and unjust" (*id.*) rationale for denying DACA violates Rueda's Equal Protection and Substantive Due Process rights under the Fifth Amendment and must be set aside on those bases.

RUEDA'S MEMO OF P&A's ISO MOTION FOR SUMMARY JUDGMENT
US 167567697v1

In denying Defendants' motion to dismiss, this Court also ruled that Rueda had pleaded sufficient facts to raise an inference that Defendants' denial of Rueda's DACA application was based on an ulterior motive, namely her speech and petitioning activity directed at Defendants, which is protected by the First Amendment. Dkt. 48, at 19-21. The Court cited the temporal proximity between Rueda's First Amendment activity and the adverse action by USCIS, as well as the lack of any other examples of similarly situated individuals being denied DACA. *Id.* Defendants have chosen not to present any evidence in rebuttal, resting instead on the stated rationale that Rueda should be denied DACA based on her association with her parents. But the evidence supports this Court's suspicion that the stated reason was a pretext—worse yet, an unconstitutional pretext—for their unlawful retaliation against her free speech and petitioning in support of her mother and immigrants' rights generally. Defendants' failure to rebut Rueda's showing warrants judgment in her favor on the First Amendment claim.

Denials of DACA are extraordinarily rare. Over the life of the program, 95% of applications were granted DACA after case review. RJN Ex. 4. Defendants have conceded they are unable to identify even a single specific example of an individual who, like Rueda, satisfied DACA's objective eligibility requirements, but still had their DACA application denied. RJN Ex. 3. The record before this Court contains no examples of any individuals, other than Rueda, being denied DACA by virtue of their association with their families. The record is likewise devoid of any examples of individuals, other than Rueda, who were denied DACA, despite an application receiving full-throated support from national leaders like Senator Kamala Harris, local leaders like Mayor Eric Garcetti, and community leaders in universities and faith organizations.

The evidentiary record shows instead that Defendants repeatedly targeted for adverse action those who exercised their First Amendment rights in support immigrants and that, at the time Defendants were evaluating Rueda's DACA

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

application, she was receiving widespread coverage in the media for her activism against Defendants.  Indeed, shortly before denying her DACA application, Defendants conducted a terrifying arrest operation against Rueda that played out like a gang-style kidnapping.  Plainclothes officers in unmarked vehicles boxed her in, hauled her away in her pajamas without identifying themselves as law enforcement or explaining why they were arresting her, and kept her in custody for three weeks.  A representative of the arresting agency then proceeded to affirmatively influence Rueda's DACA review process.  Confirming the injustice of Defendants' blatant act of intimidation, a neutral Immigration Judge released Rueda without bond soon after her arrest, described her as a model member of the community, and concluded she was a "prime candidate" for DACA whose application was "likely to succeed."  CAR 0142.

The inescapable conclusion from the unrebutted evidence is that Rueda's DACA application was singled out for denial precisely because her First Amendment activity evoked Defendants' ire.  Because the First Amendment prohibits Defendants from retaliating against Rueda based on her speech and petitioning activity, the Court should also grant summary judgment on Rueda's First Amendment claims.

## STATEMENT OF FACTS

### A.    The DACA Program

The DACA program's purpose is to protect "certain young people who were brought to this country as children and know only this country as home [because] these individuals lacked the intent to violate the law" when they were brough to this country.  RJN Ex. 1 [DACA Memo], at p. 1.  Among other benefits of the program, DACA recipients are permitted to remain in the United States for specific renewable periods of time and are eligible to receive employment authorization.  *Id.*; 8 C.F.R. § 274a.12(c).

The DACA Memo that established the program set forth five objective criteria for eligibility.  An applicant must show she (1) arrived in the United States before age

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

16; (2) has five years continuous residence in the United States; (3) meets certain educational or military service requirements; (4) has no significant criminal convictions and does not "otherwise pose a threat to national security or public safety"; and (5) is younger than 30.  RJN Ex. 1 [DACA Memo], at P. 1.  The DACA Memo directs that the Government "should" defer action "against individuals who meet the above criteria."  *Id.* at pp. 2-3.

Denial of a DACA application is rare.  The Government has approved approximately 95% of all applications after case review.  RJN Ex. 4 [DACA Stats.], at 2.

Denial of an application meeting all five of the objective criteria listed above is even more rare.  Indeed, "USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the [DACA Memo], but still had his or her application denied based solely upon discretion."  RJN Ex. 3 [Rescission Memo], at note 1.  Not even one.

### B.  Defendants' Animus Towards Immigration Activists

DACA was established in 2012.  RJN Ex. 1 [DACA Memo].  In 2017, the new administration sought to rescind DACA, but that rescission was enjoined by several courts, including the Ninth Circuit.  *See Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 510-11 (9th Cir. 2018); RJN Ex. 3 [Rescission Memo].

During the period of time when the administration sought to end DACA, a striking pattern emerged:  undocumented people who garnered media attention supporting DACA or criticizing immigration enforcement authorities soon became the subject of well-publicized arrests, deportations, or other adverse immigration actions.  For example:

- In March 2017, after Daniela Vargas spoke in favor of DACA at a news conference,  she "was arrested in what Immigration and Customs

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

Enforcement called a 'targeted immigration enforcement action.'"  RJN Ex. 59.

- In June 2017, two Migrant Justice activists were reportedly arrested by ICE officers after they participated in a demonstration on behalf of immigrant farmworkers.  RJN Ex. 62

- In December 2017, after Baltazar Aburto Gutierrez was quoted in local newspapers about his girlfriend's deportation, an ICE officer reportedly arrested him and told him "My supervisor asked me to come find you because of what appeared in the newspaper."  RJN Ex. 63.

- In January 2018, Amer Othman Adi began a well-publicized hunger strike while in ICE custody.  The House Judiciary Committee passed a private bill to allow him to remain in the country, but ICE officers reportedly deported him before the bill could become law.  RJN Ex. 66.

As shown by these and other numerous examples in Rueda's requests for judicial notice (RJN Exs. 59-68), Defendants created a chilling atmosphere in which it was widely reported and understood that suspected undocumented immigrants who drew the attention of the media in support of immigrants' rights risked drawing the attention of immigration enforcement authorities for adverse action.

### C.   Rueda's Activism and Service to Her Community

Rueda is the paradigmatic "Dreamer."  She was brought to this country from Mexico when she was six years old.  Rueda Decl. ¶ 2.  She is a college graduate and immigration rights activist.  *Id.* ¶¶ 4-5.  She serves as a well-known leader of the Los Angeles Immigrant Youth Coalition.  *Id.* ¶ 5.  Her speech and activism have garnered media attention, and she has received the support of United States Senator Kamala Harris and Los Angeles Mayor Eric Garcetti, among many others.  *Id.* ¶¶ 17; CAR 0054; 0081; 0198.

Rueda has no criminal history.  Rueda Decl. ¶ 15.  Beyond the events of that are the subject of this litigation, her only encounters with law enforcement consist of

two arrests at peaceful protests, neither of which led to charges being pursued against her.  *Id.*; CAR 0141.

### D.   Defendants' Arrest, Detention, and Pretextual Denial of Rueda's DACA Application

In spring 2017, Rueda garnered media attention and the backing of community and political leaders in support of her successful campaign protesting her mother's unjust arrest and detention by immigration officers.  Rueda Decl. ¶¶ 6; RJN Ex. 11-21.  Less than one week after Ms. Rueda's campaign helped secure her mother's release, plainclothes Border Patrol officers surrounded and arrested Rueda while she was moving her car in her pajamas one early morning outside of her aunt's apartment in East Los Angeles.  Rueda Decl. ¶¶ 8-9.  Defendants took Rueda to San Diego and held her in detention, incommunicado from her family for weeks.  *Id.* ¶¶ 11-12.

On June 9, 2017, an Immigration Judge—citing the high likelihood that Rueda's then-forthcoming DACA application would be granted and the lack of any evidence whatsoever justifying her detention—released her without bond.  CAR 0154-55, 0173.  The Immigration Judge found she was not a flight risk or threat to public safety, a determination that the Government unsuccessfully appealed to the Board of Immigration Appeals.  CAR 0154-55, 0165-70.  Rueda's bond determination application—which is part of the administrative record in this case— was supported by 45 letters from elected officials, local and national organizations, leaders and professors at Cal. State L.A., Roosevelt High School teachers, and other leaders and community members describing Rueda as a highly valued asset to the community.  CAR 0189-295.

Rueda filed her DACA application on June 16, 2017.  CAR 0023.  Rueda's application demonstrated she met all of the objective DACA criteria (CAR 0038), and contained letters of support from numerous community and political leaders, including federal and local lawmakers, such as Senator Kamala Harris, Representative Karen Bass, and Mayor Eric Garcetti, university administrators, and professors. CAR 0054-60, 81-84, 93-95.

However, on June 29, 2017—in the midst of extensive "Free Claudia" coverage in the media—Border Patrol Agent Holmes sent an unsolicited email to the "DACA Terminations" email address at USCIS (CAR 0122), which resulted in USCIS issuing a memorandum recommending denial of Rueda's DACA application. CAR 0123-0124.  The stated reason for the denial was that "[a]lthough there is no evidence [Rueda] has ever been directly involved in her parents' [alleged criminal] operation, she has lived with them into adulthood," and "CBP classifies her as an associate to the Rueda TCO by virtue of familial relation in [REDACTION]."  *Id.* This recommendation went to "HQ" for review within USCIS, where it sat without action for nearly two months, until Agent Holmes again inquired, resulting in "expedited" review and denial.  CAR 0117-0119.

When denying her DACA application, Defendants did not contend (internally or in her denial notice) that Rueda engaged in any criminal misconduct or otherwise posed a threat to national security or public safety.  CAR 0109, 0124.[1]  The record contains no evidence that any other person has been denied DACA based on the alleged wrongdoing of his or her parent.

## ARGUMENT

### I.  Punishing Rueda for Her Parents' Alleged Wrongdoing Violates Equal Protection and Freedom of Association.

"When [governmental] conduct burdens a fundamental right or makes a distinction based on a suspect classification, the court employs strict scrutiny review."  *Spirit of Aloha Temple v. Cty. of Maui*, 409 F. Supp. 3d 889, 910 (D. Haw. 2019) (citing *Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002) ("We apply strict scrutiny if the governmental enactment targets a suspect class or burdens the exercise of a fundamental right.") (internal quotation omitted))). Governmental action survives strict scrutiny only if it is "narrowly tailored to a

---

[1] Under the DACA SOP, a denial based on public safety concerns would have contained the language "you do not warrant a favorable exercise of prosecutorial discretion because of public safety concerns."  RJN Ex. 2 [DACA SOP], at 105 & Appx. F.  Rueda's denial did not contain this language.  CAR 0109.

1    compelling state interest." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015);

2    *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (*en banc*).

3        As the Supreme Court has held, the right to familial relations is the "oldest of

4    the fundamental liberty interests recognized," *Troxel v. Granville*, 530 U.S. 57, 65

5    (2000); *see Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (acknowledging the liberty

6    interest in familial relations).  Government interference with the right of familial

7`   relations is therefore subject to strict scrutiny and "cannot be upheld unless it is

8    supported by sufficiently important state interests and is closely tailored to effectuate

9    only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978); *Chi Iota Colony*

10   *of Alpha Epsilon Pi Fraternity v. City Univ. of New York*, 502 F.3d 136, 143 (2d Cir.

11   2007) ("[W]here a governmental regulation substantially interferes with close

12   familial relationships, the most exigent level of inquiry—strict scrutiny—is

13   applied."); *see also Honolulu Weekly*, 298 F.3d at 1047 (strict scrutiny requires that

14   action be "narrowly tailored to serve a compelling government interest").

15       The Ninth Circuit has broadly recognized a fundamental right of familial

16   association between parents and children, including adult children:

17       The right to familial association is a recognized liberty
18       interest under the First and Fourteenth Amendments
         protected from state interference without due process of
19       law. The right extends not only to the reciprocal rights of
         parents and their minor children (see, e.g., *Kelson v. City of*
20       *Springfield,* 767 F.2d 651 (9th Cir.1985), but to the rights of
         parents toward their adult children (see, e.g., *Lee v. City of*
21       *Los Angeles,* 250 F.3d 668, 685 (9th Cir.2001), *Strandberg*
         *v. City of Helena,* 791 F.2d 744 (9th Cir.1986), and *Curnow*
22       *by and Through Curnow v. Ridgecrest Police,* 952 F.2d
         321, 325 (9th Cir.1991)), the rights of adult children toward
23       their parents (*Curnow,* supra, 952 F.2d at 325, *Smith v. City*
         *of Fontana,* 818 F.2d 1411, 1419 (9th Cir.1987), overruled
24       on other grounds by *Hodgers-Durgin v. de la Vina,* 199
         F.3d 1037 (9th Cir.1999)), and the rights of a spouse (*Byrd*
25       *v. Guess,* 137 F.3d 1126, 1134 (9th Cir.1998).

26   *Reyes v. Cty. of San Joaquin*, No. CIVS040428FCDPANPS, 2005 WL 2105030, at

27   *2 (E.D. Cal. Aug. 31, 2005); *Zion v. Cty. of Orange*, 874 F.3d 1072, 1076 (9th Cir.

28   2017) ("Parents have a Fourteenth Amendment liberty interest in the companionship

8

and society of their children.") (internal quotation omitted); *Farmer v. Las Vegas Metro. Police Dep't*, No. 218CV00860GMNVCF, 2019 WL 4777312, at *6 (D. Nev. Sept. 30, 2019) (holding parent may bring claim based on relationship with adult child); *Smith v. Pierce Cty.*, 218 F. Supp. 3d 1220, 1228 (W.D. Wash. 2016) (holding parent may bring claim based on relationship with their adult nondependent son); *Rentz v. Spokane Cty.*, No. CV-05-83-AAM, 2006 WL 8437720, at *11 (E.D. Wash. Aug. 4, 2006) (same).

Here, Defendants' stated reason for denying Rueda's DACA application is that they purport to believe her parents are part of a criminal organization. CAR 0124. Although the Government concedes that "there is no evidence [Rueda] has ever been directly involved" in any alleged criminal activity, USCIS decided to punish her anyway and denied her DACA application "by virtue of familial relation" with her parents. *Id.* Because the Government's stated justification for denying DACA—taken at face value—is not narrowly tailored to any legitimate government interest, much less a compelling one, it violates the Fifth Amendment right of equal protection and the First Amendment right of free association.

In denying Agency Defendants' motion to dismiss Rueda's equal protection claims, this Court held that "Plaintiff's allegations and the available record [did] not establish that USCIS's conduct was 'suitably tailored to serve a compelling state interest.'" Dkt. No. 48, at22-23 (citation omitted). The undisputed evidence now proves that initial conclusion: the certified administrative record produced by Defendants establishes that USCIS's conduct was not narrowly tailored to serve a compelling government interest, because the DACA denial's sole stated basis was Rueda's family relationship, and its sole stated purpose was to penalize Rueda for that relationship—with "no evidence" that she engaged in any wrongdoing. CAR 0124.

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

### A.   Strict scrutiny applies because the Government's DACA denial interferes with a fundamental right.

The "fundamental liberty interest" in familial relations protects "the companionship and society of [a parent] and his or her child." *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (internal quotation omitted). "[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." *Id.* (quoting *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987).

A plaintiff need not prove the state intended to interfere with a familial relationship to establish a claim. "The Ninth Circuit recognizes a Fourteenth Amendment liberty interest of parents in the companionship and society of their adult children, even when the deprivation of that interest is incidental to the state action." *Valdez v. City of Phoenix*, No. CV-18-0921-PHX-DGC, 2019 WL 5390508, at *4 (D. Ariz. Oct. 22, 2019).

The decision in *Kipps v. Caillier*, 205 F.3d 203, 206 (5th Cir. 2000) ("*Kipps II*"), is instructive of the breadth of intrusions that implicate this fundamental right. There, the plaintiff was an assistant football coach for the University of Southwestern Louisiana ("USL"). *Kipps v. Caillier*, 197 F.3d 765, 766 (5th Cir. 1999) ("*Kipps I*"). The plaintiff was fired after his adult son committed to play football for Louisiana State University ("LSU") instead of USL. *Id.* at 767. The defendants argued "that in order to have an actionable claim based on familial association there must be a permanent and involuntary separation between parent and child." *Kipps II*, 205 F.3d at 205. The appellate court rejected the argument, reasoning that adverse government action based on family association was sufficient to raise a constitutional claim. *Id.* at 206 ("Plaintiffs' claim that Kipps was terminated because his son chose to play football for LSU alleges the impingement of a cognizable constitutionally protected interest.").

Similarly, in *Moore v. City of E. Cleveland*, 431 U.S. 494, 498 (1977), a city ordinance prohibited grandparents from living with their two grandchildren. The

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

Supreme Court held that strict scrutiny applied, based on the "long recognized … freedom of personal choice in matters of marriage and family life." *Id.* at 499.  The Court therefore concluded that "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Id.*

As in *Moore*, the Government has penalized Rueda for living with her family—namely, her parents.  The Government denied her DACA application, on the stated reasoning that "[a]lthough there is no evidence the requestor has ever been directly involved in her parents' [alleged] TCO operation, she has lived with them into adulthood." CAR 0124.  Thus, even though there is no evidence that Rueda ever participated in any criminal activity or organization, the Government "classifies her as an associate" of one solely "by virtue of her familial relation" and denied her DACA application on that basis. *Id.*; *see also* Dkt. No. 48, at 22-23 (Defendants "submitted email correspondence showing that USCIS denied Plaintiff's DACA application **because of** Plaintiff's decision to live with her family.") (emphasis added).

Moreover, the penalty that the Government imposed on Rueda for associating with her family is far more serious than the loss of the football coaching job at issue in *Kipps*.  The DACA program was designed to protect the interests of "young people who were brought to this country as children and know only this country as home." Dkt. No. 48 at 4 (quoting RJN Ex. 1 [DACA Memo], at 1).  Because the Government's DACA denial imposes a severe penalty on Rueda (i.e., withholding the benefit for which she has demonstrated eligibility: lawful presence and employment authorization in the only country she has ever known) based on her association with her family, it "cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki*, 434 U.S. at 388.

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

**B.     The Government's DACA denial is not narrowly tailored to advance
a compelling interest.**

The Government's stated interest in denying Rueda DACA is to punish her for receiving the benefits of her relationship with her parents.  CAR 0124 ("Since the requestor has lived into adulthood at both addresses being targeted by the investigation, it is very likely that she is aware of her parents' criminal activities and is a beneficiary of the profits from their TCO.").  This justification fails strict scrutiny because there is no compelling government interest in punishing children for the (alleged) sins of their parents.  To the contrary, "if any fundamental assumption underlies our system, it is that guilt is personal and not inheritable."  *Korematsu v. United States*, 323 U.S. 214, 243 (1944) (Jackson, J., dissenting)[2]; *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982) ("[G]uilt by association is a philosophy alien to the traditions of a free society."); *Elfbrandt v. Russell*, 384 U.S. 11, 19 (1966) ("[T]he doctrine of 'guilt by association' … has no place here.").

Indeed, the Supreme Court has already rejected the sins-of-the-father approach in the immigration context.  *See Plyler v. Doe*, 457 U.S. 202, 220 (1982).  In *Plyler*, the state of Texas denied public education to undocumented children, arguing that "a State may withhold its beneficence from those whose very presence within the United States is the product of their own unlawful conduct."  *Id.* at 219-20.  The Court rejected application of this logic to the children of lawbreakers because "the children who are plaintiffs in these cases can affect neither their parents' conduct nor their own status."  *Id.* at 220 (internal quotation omitted).   The Court concluded that "[e]ven if the State found it expedient to control the conduct of adults by acting against their children, ***legislation directing the onus of a parent's misconduct***

---

[2] While Justice Jackson wrote in dissent in *Korematsu*, the Supreme Court has confirmed "what is already obvious:  *Korematsu* was gravely wrong the day it was decided, has been overruled in the court history, and—to be clear—'has no place in law under the Constitution.'"  *Trump v. Hawaii*, 138 S.Ct. 2392, 2423 (2018) (quoting Justice Jackson's dissent in *Korematsu*, 323 U.S. at 248).

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

1    ***against his children does not comport with fundamental conceptions of justice***." *Id.*

2    (emphasis added).

3          Notably, the Court did not rest its decision on a right to education.  To the

4    contrary, it held that "education is not a 'right' granted to individuals by the

5    Constitution." *Id.* at 221.  Rather, the "illogical and unjust" practice of "imposing

6    disabilities on the child … contrary to the basic concept of our system that legal

7`   burdens should bear some relationship to individual responsibility" was sufficient to

8    invalidate the state's action.  *Id.* at 220 (internal quotation omitted).

9          This principle is enshrined in the Constitution and older even than the Bill of

10   Rights.  The Constitution provides that "[e]ven if all of one's antecedents had been

11   convicted of treason, the Constitution forbids its penalties to be visited upon him, for

12   it provides that 'no Attainder of Treason shall work Corruption of Blood, or

13   Forfeiture except during the Life of the Person attained.'" *Korematsu*, 323 U.S. at

14   243 (Jackson, J., dissenting; quoting U.S. Const., Art. III, § 3).  James Madison

15   explained in the Federalist Papers that the purpose of the Corruption of Blood clause

16   was to prevent the government "from extending the consequences of guilt beyond the

17   person of its author."  The Federalist No. 43, at 269 (James Madison) (Henry Cabot

18   Lodge ed., New York, G.P. Putnam's Sons 1888).

19         And courts have repeatedly reaffirmed the anti-corruption of blood principle in

20   numerous contexts beyond the literal scope of the Constitutional clause.  *Clark v.*

21   *Jeter*, 486 U.S. 456, 461 (1988) ("[W]e have invalidated classifications that burden

22   illegitimate children for the sake of punishing the illicit relations of their parents

23   ….."); *Jimenez v. Weinberger*, 417 U.S. 628, 632 (1974) (holding state's denial of

24   benefits to illegitimate children was "illogical" and "unjust"); *King v. Smith*, 392 U.S.

25   309, 320 (1968) (holding state's "interests in discouraging immorality and

26   illegitimacy" did not permit denial of welfare benefits to children whose mother

27   "cohabits" with a man); *id.* at 336 n. 5 ("This penalizing the children for the sins of

28   their mother is reminiscent of the archaic corruption of the blood ….") (Douglas, J.,

concurring); *St. Ann v. Palisi*, 495 F.2d 423, 424 (5th Cir. 1974) (holding school could not suspend student based on parent's battery of school official).

The Government's asserted interest in denying DACA benefits to Rueda based on the alleged wrongs of her parents "by virtue of familial relation," CAR 0124, with them—when "there is no evidence" of wrongdoing by her, *id.*—is inimical to the Constitution's command that "guilt is personal and not inheritable." *Korematsu*, 323 U.S. at 243 (Jackson, J., dissenting). The Government's DACA denial therefore does not serve any legitimate government interest, much less a compelling one, and is unlawful for that reason alone.

Even if meting out punishment for a parent's actions were somehow a compelling interest, the Government's DACA denial would still fail the narrow tailoring portion of the strict scrutiny analysis for numerous reasons. Under the narrow tailoring analysis, the state's action "must advance a compelling state interest ***by the least restrictive means available***." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984) (emphasis added) (internal quotation omitted). If a parent has profited from crime, the least restrictive means of remedying that act is to seek to punish the parent or to seek a return of illicit gains from the parent, not to punish the child for associating with her parent.

Furthermore, when applying strict scrutiny, the government's "burden is not satisfied by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993). The Government's denial here is based on speculation piled upon speculation. The record is devoid of any proof that Rueda's parents engaged in a criminal enterprise. Rather, the record contains only the Government's allegations against her parents. CAR 0124. If the Government seeks to use Rueda's constitutionally protected relationship with her parents against her, the Government should be required to do more than merely stand on its allegations against her parents. *Cf. Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (holding intermediate scrutiny "is not satisfied by mere speculation or conjecture").

14

As to Rueda's connection to her parents' alleged wrongdoing, it is undisputed that "there is no evidence [Rueda] has ever been directly involved in her parents' [alleged] TCO operation."  CAR 0124.  The Government's conclusions that "it is very likely" that Rueda "is aware of her parents' activities" and "is a beneficiary of the profits from their TCO" is likewise nothing but the rankest of speculation.  They present no evidence for any of them.  Piling speculation about Rueda's relationship with her parents upon speculation about her parent's unproved alleged wrongdoing falls far short of meeting the Government's strict scrutiny burden.

Because the Government has failed to establish a compelling interest in penalizing Rueda for her parents' alleged actions and because denial of Rueda's DACA application is not the least restrictive means of vindicating any alleged wrongdoing by Rueda's parents, the Court must find that the Government's denial of DACA violates the Fifth Amendment's guarantee of equal protection and the First Amendment's guarantee of freedom of association.  As the Court already noted at the motion to dismiss stage, "the available record [did] not establish that USCIS's conduct was 'suitably tailored to serve a compelling state interest.'"  Dkt. No. 48, at 22-23.  (citation omitted).  The undisputed evidence in the expanded record confirms that conclusion.  The Government's own certified administrative record proves that USCIS cannot meet its strict scrutiny burdens, and summary judgment for Rueda is appropriate.

### C.    The Government's unconstitutional DACA denial exceeds the limits of judicial deference.

The Government has consistently taken the position that immigration is a lawless zone where the whim of the executive trumps the Constitution.  *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017).  Not so.  "[U]nreviewability … runs contrary to the fundamental structure of our constitutional democracy."  *Id*.  Thus, "the Supreme Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over immigration or

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

are not subject to the Constitution." *Id.* at 1162.  To be sure, courts have deferred to the political branches in certain circumstances, but none resembling the circumstances present here.  This case is about the routine administration of government benefits, governed by written policies and eligibility criteria, covering a group with deep ties to the country—specifically here, a lifelong California resident and local college graduate who poses no safety or security threat.  In these circumstances, the Court has the power and the duty to vindicate individual constitutional rights.  *Webster v. Doe*, 486 U.S. 592 (1988)).

In *Trump v. Hawaii*, Congress expressly vested the President with discretion to deny entry to certain categories of aliens based on national security concerns.  138 S. Ct. 2392, 2408 (2018).  The Court applied a deferential standard of review to allegations that a Presidential proclamation discriminated against Muslims, citing (1) that "foreign nationals seeking admission have no constitutional right to entry," (2) the "particular force" of deference in immigration cases "that overlap with the area of national security," (3) the "facial[] neutral[ity] towards religion" of the proclamation, and (4) a Congressional delegation that "exudes deference to the President in every clause." *Id.* at 2408, 2418–19, 2429 (internal quotation omitted).  None of those factors are present here.

First, Rueda is not seeking admission to the United States.  She is part of the undocumented "shadow population" residing in our borders through no fault of her own for whom our "Nation … prides itself on adherence to principles of equality under law." *Plyler*,  457 U.S. at 219.  "The Supreme Court has … acknowledged a longstanding distinction between … protected status within the national community and unprotected status at the threshold of admission." *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1065 (9th Cir. 1995) (internal quotation omitted); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1107 (N.D. Cal. 2018) (distinguishing *Trump v. Hawaii* on grounds that "TPS beneficiaries are living and have lived in the United States for lengthy periods with established ties to the community"); *CASA de*

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

*Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 322–25 (D. Md. 2018) (holding *Hawaii v. Trump* does not apply to U.S. residents).

Second, Rueda presents no national security concerns. *See CASA de Maryland*, 355 F. Supp. 3d at 322-25 (holding *Hawaii v. Trump* inapplicable to case that did not involve national security concerns). To the contrary, the Government cited no public safety concerns in denying Rueda's DACA application, and the record reveals that the Government has no such concerns. CAR 0109, 0124. Indeed, an Immigration Judge employed by the Government describes Rueda as a person with "humility, respect, and passion," who is "inspiring … based on her pursuit of education, advocacy for gender and racial justice, and her ties to the community," and who is "not a danger to the community." CAR 0141. Deference is therefore not warranted here. *See NAACP v. DHS*, 364 F. Supp. 3d 568, 576 (D. Md. 2019) ("[T]he distinguishing factors [from *Hawaii v. Trump*] include the absence of national security concerns and the presence of foreign nationals in the United States ….").

Third, the DACA denial was not facially neutral to Rueda's constitutionally protected association with her family. The denial of Rueda's DACA was expressly made "by virtue of familial relation." CAR 0124.

Fourth, no statute authorizes the executive branch to discriminate based on familial relations in administering DACA benefits. Thus, Congress has not "exercise[d] its broad power over immigration and naturalization" in a manner that impedes judicial review, and its ability to "make[] rules that would be unacceptable if applied to citizens" is not implicated by the bureaucratic decision to deny DACA here. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotation omitted); *cf. Doe v. Trump*, 288 F. Supp. 3d 1045, 1069 (W.D. Wash. 2017) ("[T]he Supreme Court noted the 'limited scope of judicial inquiry into *immigration legislation*' and emphasized 'over no conceivable subject is *the legislative power of Congress* more complete than it is over' the admission of aliens.'") (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); emphasis supplied by *Doe v. Trump*).

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

*Fiallo* is similarly distinguishable.  *Fiallo* affirmed a Congressional decision to subject fathers of illegitimate children to a quota system for entry into the United States rather than a system of unlimited entry for parents of legitimate children. *Fiallo*, 430 U.S. at 791.  *Fiallo* did not involve executive action adverse to a person with deep ties to the United States.  *Khouzam v. Hogan*, 529 F. Supp. 2d 543, 567–68 (M.D. Pa. 2008) (holding *Fiallo* "ruled that it was inappropriate for a court to inquire as to the justifications for the legislative decision.").

Similarly, *Kleindienst* held "an unadmitted and nonresident alien had no constitutional right of entry to this country as a nonimmigrant."  *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).  Rueda's case has nothing to do with the right of entry, and the Ninth Circuit has declined to extend *Kleindienst* beyond that context. *Am.-Arab Anti-Discrimination Comm.*, 70 F.3d at 1065.

Furthermore, even if judicial deference were warranted here, the Court should find that Rueda's DACA denial fails even rational basis review.  *See Ramos v. Nielsen*, 321 F. Supp. 3d 1083,1120 (N.D. Cal. 2018) ("If the challenged action by the Administration were otherwise illegitimate and unlawful, the deprivation of Plaintiffs' liberty interests in family integrity, even if typically insufficient to defeat the government's interest in enforcing valid immigration laws, may be unlawful where it is not supported by a legitimate government interest.").  Here, the DACA denial was not based on any legitimate government interest.  Rueda satisfied all of the objective factors for DACA, which should have resulted in her DACA application being granted.  The denial was purportedly based on a desire to punish a child for alleged wrongs of her parents, contrary to "fundamental conceptions of justice." *Plyler*, 457 U.S. at 220.

Because the Constitution requires the judicial branch to prohibit the executive from imposing penalties on children living in the United States as punishment for their parent's alleged wrongdoing, no deference is owed to the Government's unconstitutional denial of Rueda's DACA application.

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

## II.     Punishing Rueda for her Parent's Alleged Wrongdoing Violates Substantive Due Process.

Like the Equal Protection Clause, substantive due process also protects the right of familial association.  *Curnow*, 952 F.2d at 325; *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established.").  In the Ninth Circuit, "'[u]nwarranted state interference' with the relationship between parent and child violates substantive due process."  *Kerby v. Sheridan*, No. 2:12-CV-00544-MO, 2015 WL 1004427, at *4 (D. Or. Mar. 5, 2015) (quoting *Crowe v. Cy. of San Diego*, 608 F.3d 406, 441 (9th Cir. 2010)); *see also Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1161 (S.D. Cal. 2018) ("[T]here is no dispute the constitutional right to family integrity applies to aliens ….").  For the same reasons discussed with respect to Rueda's equal protection and free association claims, *supra*, the Government's denial of her DACA application fails the Fifth Amendment's "unwarranted interference" standard.

Some cases in the Ninth Circuit apply a higher standard than "unwarranted interference," requiring that conduct "shock the conscience or offend the community's sense of fair play and decency."  *Hollander v. Rainier Sch. Dist.*, No. 3:11-CV-01200-HU, 2013 WL 1193888, at *8 (D. Or. Mar. 22, 2013) (internal quotation omitted).  However, "[t]here is no support in the relevant case law for this assertion" with respect to familial association claims.  *Crowe*, 608 F.3d at 441 n. 23.

Even if the Court applies the higher standard, it should still find that denying Rueda's DACA application based on the alleged wrongdoing of her parents—with "no evidence" of personal wrongdoing, CAR 0124—violates substantive due process.  Penalizing children for their parent's conduct is not consistent with the "community's sense of fair play and decency."  *Hollander*, 2013 WL 1193888, at *8.  To the contrary, it is inimical to "fundamental conceptions of justice."  *Plyler*, 457 U.S. at 220; *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 178 (1951) ("guilts by association" are "one of the most odious institutions of history") (Douglas,

J., concurring).  Because penalizing children by denying benefits for which they've demonstrated eligibility as punishment for their parent's conduct is outrageous under any conceivable standard of review, the Government's DACA denial violates substantive due process.  The Constitution prohibits such "arbitrary action of government."  *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

## III. Defendants Violated the First Amendment by Denying Rueda's DACA Application Based on Her Protected Speech and Petitioning Activity.

A plaintiff may establish a First Amendment retaliation claim if (1) she engaged in constitutionally protected activity, (2) she suffered adverse action that would chill an ordinary person, and (3) there was a substantial causal relationship between the protected activity and the adverse action.  *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).  "[C]ausation is under stood to be but-for causation."  *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  "[U]pon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of …"  *Id.*

Here, Rueda engaged in constitutionally protected activity by engaging a public campaign to protest the Government's detention of her mother.  Rueda Decl. ¶¶ 6-7.  The campaign garnered significant media attention and support by political leaders and flooded the Government with requests for her release.  *Id.*; RJN Exs. 9-11.  Thus, there can be no dispute that Rueda engaged in protected political activity of the "highest order of importance."  Dkt. No. 48, at 11.

The adverse action she suffered as a result—denial of her DACA application and its attendant benefits of lawful presence and employment authorization—would chill an ordinary person as a matter of law.  *See Mendia v. Garcia*, No. 10-CV-03910-MEJ, 2016 WL 2654327, at *9 (N.D. Cal. May 10, 2016) (holding threatened deportation satisfies adverse action requirement).

Moreover, there can be no genuine dispute that Rueda's First Amendment activism was a but-for cause of her DACA denial.  As a threshold matter, denial of a DACA application is an extraordinarily rare event.  The governing DACA Memo

20

US 167567697v1

states that where an applicant meets all of the objective criteria, the application "should" be granted.[3]  RJN Ex. 1 [DACA Memo], at pp. 2-3.  Consistent with the DACA Memo, according to the Government's statistics, as of September 30, 2019, the Government granted 95% of the 2.65 million submitted DACA applications.[4]  RJN Ex. 4 [DACA Stats.], at p. 2.[5]  And, as this Court noted, "the fact that USCIS has not been able to identify any specific denial cases where an applicant appeared to satisfy the objective DACA criteria further supports Plaintiff's assertion that her DACA application was denied because of her political activism."  Dkt. No. 48, at 21 (citing DACA Rescission Memo, at n.1).

Thus, even if Rueda's application were a run-of-the-mill application, the denial would have been a unique event.  But Rueda's application was no run-of-the-mill application.  On its face, it was one that was extraordinarily likely to succeed

---

[3] Rueda requests that the Court consider extra-administrative record materials where the agency is likely to have relied on documents not in the record, such as administrative materials governing the exercise of discretion; where necessary to explain the technical and complex subject matter of DACA applications; and to establish that denial of DACA was in bad faith or for illegitimate reasons.  *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (discussing when courts may consider evidence outside the administrative record).

[4] As of September 30, 2019, the Government approved 2,508,958 applications after case review, denied 98,868, and 38,595 were still pending.  RJN Ex. 4 [DACA Stats.], at p. 2.

[5] In *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019), the Supreme Court held that a heightened causation standard applies to a claim for retaliatory arrest or criminal prosecution.  Under the heightened standard, causation generally cannot be proved if there was probable cause for arrest or prosecution.  *Id.*  Because a DACA denial is neither an arrest nor a criminal prosecution, *Nieves* does not apply.

Moreover, *Nieves* stated this heightened standard does not apply in situations where violation of the law "is endemic but rarely results in arrest," such as jaywalking.  *Id.* at 1728.  "In such a case … probable case does little to prove or disprove the casual connection between animus and injury."  *Id.*  Assuming *Nieves* applies outside the arrest or criminal prosecution context, the "jaywalking" exception to *Nieves* also applies.  Although the Government claims it has discretion to deny 100% of all DACA applications, the Government has denied a small fraction of them.  RJN Ex. 4 [DACA Stats.], at p. 2.  Moreover, there is no evidence that anyone other than Rueda has been denied DACA based on their parent's alleged wrongdoing.  Thus, the fact that the Government had discretion to deny Rueda's application "does little to prove or disprove the causal connection between animus and injury."  *Nieves*, 139 S. Ct. at 1727.

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

Senator Kamala Harris, for example, submitted a letter in support of Rueda stating that "Claudia embodies those fundamental ideals that define who we are as Americans," "is a treasured member of her community," and "exhibits tremendous character." CAR 0054. Congressmember Karen Bass described her as a "valuable member and leader in her community" who would have a "positive impact … if she were allowed to remain in the United States." CAR 0055. Mayor Eric Garcetti wrote, "Ms. Rueda is just the sort of 'Dreamer' form whom Deferred Action for Childhood Arrivals (DACA) was created." CAR 0081. Councilmember Gilbert Cedillo stated she "has demonstrated intelligence and heart that has been invaluable to her community" and "is deeply respected by her peers and the broader community." CAR 0056. Ericka Verba, the Director of Latin American Studies at California State University Los Angeles, stated Rueda "is a constructive and caring person who strives to give back to her community" and "is a true representative of all that is good in her generation." CAR 0057. Rueda's professors described her as a woman who "exemplifies the qualities of character that we celebrate in our nation" (CAR 0058) and "the very kind of person I want in the world where my children are growing up" (CAR 0059). These are just examples of people throughout the community who vouched for Rueda's value to our Nation. CAR 0054-60, 0081-84, 0093-95, 0189-295.

Moreover, an Immigration Judge considered Rueda's then-forthcoming DACA application and expressly relied on its strength in ruling that Rueda should be released without bond. CAR 0142. The Immigration Judge described Rueda as a "prime candidate" for DACA whose application was "likely to succeed." *Id.*

The only reasonable explanation for why such an extraordinarily strong application ended up as one small number of denials, indeed the only documented denial of an applicant who met all of the objective criteria, is that the Government was retaliating against Rueda for speaking and petitioning against the Government. The sequence of events inevitably supports that conclusion. In particular, after

Rueda's mother was arrested on April 24, 2017, she led a rally to free her mother, set up a call line for people to contact ICE and CBP on her mother's behalf, spoke with the media in protest of her mother's arrest, and attended the Sherriff's Civilian Oversight Commission where she again publicly spoke out against her mother's arrest.  Rueda Decl. ¶¶ 6-7.  Rueda's mother was ultimately released on bond on May 12, 2017.  *Id.* ¶ 6.

Just six days after her mother's release, plainclothes immigration officers showed up at Rueda's home, for the specific purpose of arresting Rueda.  Rueda Decl. ¶¶ 8-9; CAR 381-82.  At approximately 7:50 a.m., Rueda went outside her house in her pajamas to move her car for street cleaning.  Rueda Decl. ¶¶ 8-9.  Before she could move it, three unmarked vehicles surrounded her on all sides, officers asked her name in Spanish, and when she responded, stated "that's her" and put her into a white, unmarked van.  *Id.* ¶ 9.  Further indicating that Rueda was the specific target of the officers, no other person was arrested, even though the officers showed up with three unmarked cars.  *Id.* ¶ 9.[6]

Despite the lack of any evidence that Rueda was a flight risk or a public safety threat, the Government detained Rueda for weeks without allowing her any contact with her family.   Rueda Decl. ¶ 12.  While Rueda was detained, a "Free Claudia" photo went viral on the internet, and media outlets picked up and followed the story of Rueda's unjust detention.  *Id.* ¶ 14; RJN Ex. 58.

The public outcry that Rueda's speeches and petitioning generated evoked the ire of immigration enforcement agencies (*see* Statement of Facts, *supra*), who, at that time, were regularly making news by tracking and arresting prominent immigration activists.  Indeed, as just one example, in January 2018, the Government deported Amer Otham Adi after his case drew media attention, despite the House Judiciary

---

[6] To the extent the officer's reports in the administrative record contradict Rueda's account of her arrest, they do not prevent summary judgment because they are hearsay.  Fed. R. Civ. P. 56(c)(4) (a party resisting summary judgment must "set out facts that would be admissible in evidence").

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

Committee passing a private bill to allow him to remain in the country.  RJN Ex. 66.

The message to undocumented activists, repeated in case after case, was clear:  if you

generate media attention critical of immigration authorities, immigration authorities

will generate stories of your arrest, detention, and/or deportation.  RJN Exs. 12-67

Consistent with that pattern of public retaliation against immigration activists,

it was the enforcement officers who plucked Rueda's DACA application away from

the near rubber-stamp approval process for applications meeting all objective criteria.

The administrative record reveals that Border Patrol Agent Holmes, on June 29,

2017—in the midst of the "Free Claudia" media firestorm—sent an unsolicited email

to the "DACA Terminations" email address to ensure Rueda received unusual

supervisorial treatment.  CAR 0122.  In response to Holmes, the DACA reviewer

expressly stated she would "expedite the adjudication" so that Rueda's DACA could

be denied before an upcoming court date.  It was thus Border Patrol Agent Holmes's

email—on which he followed up several times to make sure the denial happened

before Rueda's immigration court hearing—that set in motion the chain of events

ending in Rueda's extraordinarily strong DACA application being denied.  In short,

the record shows that Holmes was intricately involved and invested in the process:  It

was his outreach and report that resulted in the denial recommendation, and his

follow-up requests that resulted in the expedited ultimate denial.  CAR 0117-24.

But for Agent Holmes going out of his way to flag Rueda's application for

unfavorable treatment, there is no evidence that Rueda's application would not have

been one of the overwhelming majority of applications that were granted.  Indeed,

given her satisfaction of all of the objective criteria for DACA, that conclusion was

effectively a given.  In light of the immigration enforcement agencies' publicly

flaunted animus toward immigration activists and Rueda's contemporaneous and

well-publicized activism, the Court may reasonably infer that Rueda's activism was

the cause of Agent Holmes flagging Rueda for a denial of DACA. *Coszaltzer v. City*

*of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (holding temporal proximity between

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

protection action and adverse action raises inference of retaliation).  Because Rueda's immigration activism was the first step in the chain of events that led to her DACA denial, the Court may reasonably infer that Rueda's activism was a "but-for" cause of the DACA denial.  *Hartman*, 547 U.S. at 260.

"Under these circumstances," Rueda has raised a plausible inference "that her application was denied on account of retaliatory animus."  Dkt. No. 48, at 20.  And the Government has presented no evidence to rebut the inference that its stated rationale for denying DACA—that Rueda benefitted from her parents' alleged wrongdoing (which is separately unconstitutional for other reasons discussed above)—is pretextual, and that it was used to cover for the fact that the Government targeted her and singled her out based on her political activism.  Although the Government asserts it has discretion to ignore the DACA Memo's instruction that DACA "should" be granted to individuals who meet DACA's objective requirements, it has presented no evidence that discretionary denials have ever occurred, let alone how often.  *See* RJN Ex. 3 [Rescission Memo], at 6 n.1.  Indeed, the Government has offers no evidence that any person similarly situated to Rueda—*i.e.* a person who meets all of DACA's objective criteria and who received glowing support in her community from everyone from her Senator on down—has been denied DACA based on potentially benefitting from her parent's alleged unlawful conduct.

The Government's singling out of Rueda's DACA application for denial based on her public criticism of the Government is fundamentally inconsistent with First Amendment values.  The Court should repudiate the Government's retaliatory DACA denial and grant Rueda's motion for summary judgment on this claim as well.

## CONCLUSION

For the foregoing reasons, Rueda respectfully requests the Court grant her motion for summary judgment on Count Two of the First Amended Complaint.

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1

1    Dated:  April 27, 2020          Respectfully submitted,

2                                    ARNOLD & PORTER KAYE SCHOLER LLP

3

4                                    /s/ John C. Ulin

5                                    John C. Ulin

6                                    Oscar Ramallo
                                     Vanessa Adriance
7`
                                     *Attorneys for Plaintiff*
8                                    Claudia Sarahi Rueda Vida

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUEDA'S MEMO OF P&As ISO MOTION FOR SUMMARY JUDGMENT

US 167567697v1